Whaley, Chief Justice,
delivered the opinion of the courts
The plaintiff, P. J. Carlin Construction Company, entered into a contract with the defendant, on November 27, 1933, by the terms of which it agreed to furnish all labor and materials and perform all work required for the construction of the substructures of two highway bridges over the Cape Cod Canal, Massachusetts, for the lump sum consideration of $1,327,700, the work to be performed in accordance with plans and specifications which were made a part of the contract. The bridges in question are known as the Sagamore Bridge and the Bourne Bridge.
The substructure of the Sagamore Bridge consists of four separate units of masonry, two abutments and two piers,, commonly referred to as channel piers, with one abutment, and one channel pier on each side of the canal.
The substructure of the Bourne Bridge consists of eight separate pieces of masonry, two abutments and six piers. Of the six piers, two are commonly called channel piers and four intermediate piers. One abutment, one channel pier,, *294 and two intermediate piers are located on each side of the canal.
The plaintiff, with the approval of the defendant, entered into a subcontract with the Blakeslee-Bollins Corporation, a Massachusetts corporation, to do all the excavation work required, and to furnish and provide the cofferdams for the four main channel piers at Bourne and Saga-more, including the placing of the seal concrete, material for which was to be furnished by plaintiff. Promptly after receipt of notice to proceed, plaintiff commenced work, prosecuting it skillfully and diligently, and through the agency of its subcontractor completed the work undertaken to be performed by it. Plaintiff was paid the contract price of the work as modified by the various change orders, less the sum of $1,000 which was retained by the defendant as liquidated damages under Article 9 of the contract. Upon receipt of payment plaintiff executed to the United States a release of all claims arising under the contract except the items here sued on.
The plaintiff claims it has sustained damages in connection with the construction of the two highway bridges involved, as follows: (1) Excess cost of constructing the four main channel piers over and above what would have been the cost had the subsurface conditions encountered been as represented and warranted by the defendant in the specifications, including a reasonable profit of 10 percent thereon, $231,485.24; (2) Excess cost of endeavoring to eliminate or reduce sand-streaking in the concrete, including a reasonable profit of 10 percent, $55,785.02; (3) Cost of removing certain power lines, pursuant to orders of the defendant’s officers, $1,272; (4) Cost of maintenance and operation of three complete concrete units for a period of 89 days covering the period during which the construction of the four main channel piers was delayed because of subsurface conditions, including a reasonable profit of 10 percent thereon, $79,018.02; and (5) The amount retained by the defendant as liquidated damages, $1,000; or a total of $368,560.28.
The first item of the claim is one in which plaintiff has no personal interest but is prosecuted by it solely for the benefit of its subcontractor, the Blakeslee-Bollins Corpora *295 tion. That corporation prior to the submission of bids in this case and the acceptance of plaintiff’s bid by the defendant, had examined the site of the work, the plans and specifications, the boring maps and data, and had submitted a bid for the work of constructing the substructures of the two bridges to one of the unsuccessful bidders for the entire job. When the plaintiff was awarded the contract it took over the bid submitted to the unsuccessful bidder by the Blakeslee-Rollins Corporation and entered into a contract with that corporation for the construction by it of the substructure of the two bridges for the sum of $260,000. The plaintiff, through its subcontractor, submitted to the defendant’s contracting officer the plan of the cofferdam method that it proposed to follow in the construction of the four main channel piers. The proposed method was approved by the Government’s engineers and its contracting officer.
Almost from the beginning of the wrork the subcontractor encountered difficulties in driving the sheeting. Nested and compacted boulders, forming an almost impenetrable barrier, were encountered. In endeavoring to penetrate them the surrounding soil became agitated and mixed with water, with the result that a fine free-flowing sand was produced, an inevitable consequence of the excessive driving of the sheeting. Early in March 1934, the subcontractor notified defendant’s contracting officer that it would be. impossible to construct these piers by the cofferdam method, and that it would not be possible to rest them upon undisturbed natural soil at the elevations specified. The Government at the time insisted that the work proceed in accordance with the provisions of the specifications, but the excessive hammering and the drastic measures necessary to remove the boulders, added to the dangerous condition of the ground by disturbing its stability, and the outside pressure which forced water and sand into the cofferdams, made the work hazardous and expensive. These conditions, as the work progressed, resulted in frequent conferences between plaintiff, its subcontractor, and representatives of the defendant in regard to the situation. As a result of these conferences the defendant determined in June 1934, that be *296 cause of the disturbed, conditions of the soil caused by the excessive hammering in driving the steel sheeting and the removal of boulders, and the likelihood that such conditions might continue until the bottom of the required depth was reached, the elevations prescribed should be changed thus relieving plaintiff of carrying the excavation to the required depth. Appropriate change orders were issued, providing that excavation might be stopped at elevation 55 instead of elevation 48, and that a suitable foundation would be prepared by driving bearing piles into the soil at the bottom of the excavation. As a result of these change orders three of the four piers as finally constructed rest upon an artificial foundation created by the driving of a large number of wood bearing piles, and the fourth pier rests upon a ledge of solid rock formed by the nesting and compacting of numerous heavy boulders.
Prior to the issuance of the various change orders referred to plaintiff’s subcontractor had expended in the construction of the four main channel piers $210,441.13 in excess of the amount plaintiff and the subcontractor had estimated such costs would be at that stage of the work. It is contended by plaintiff that this excess cost of the work in connection with the construction of the main channel piers and the resulting loss and damage to its subcontractor was caused by misleading and deceptive representations made by the defendant as to the subsurface conditions at the site of the piers.
Plaintiff’s subcontractor, the Blakeslee-Bollins Corporation, and C. W. Blakeslee & Sons were the prime contractors, under a contract similar to the one here in question, to furnish all labor and materials and perform all work required for the construction of the substructure of the Vertical Lift Railway Bridge over the Cape Cod Canal, at Buzzards Bay, located approximately three-quarters of a mile from the sites of the highway bridges. Upon completion of the work C. W. Blakeslee & Sons and the Blakeslee-Rollins Corporation brought suit in this court claiming that defendant’s responsible officers in inviting bids made deceptive and misleading representations as to subsurface conditions at the site of the railway bridge and that by reason of reliance upon these misrepresentations they suffered damages *297 in that the actual cost of doing the work was over and above the estimate in their bid. In an opinion carefully-analyzing both the facts and the law involved, the late Judge Williams denied the claim that officers of the defendant possessed superior knowledge as to the distribution of boulders throughout the area of the canal or at the site where the piers were constructed. C. W. Blakeslee & Sons, Inc., et al. v. United States, 89 C. Cls. 226; certiorari denied by the Supreme Court, 309 U. S. 659.
Plaintiff herein contends that it was misled by failure of defendant’s contracting officer to inform plaintiff or its subcontractor that the consulting engineers on the railway bridge had recommended use of the core-boring method to test subsurface conditions and that no method other than the caisson method be used in specifications for construction of the railway bridge piers; that dynamite had been used in making the wash borings at the railway bridge site; that a dredging company had abandoned its contract because of encountering unfavorable subsurface conditions; and that wash borings had been made at the railway bridge sites and data reported thereon.
Officers of the Blakeslee-Rollins Corporation not only knew of the existence of the, railway bridge boring data but had studied it in preparation of its bid for the railway bridge work and, in fact, utilized this information in estimating the cost of constructing the highway bridge piers. Other facts relied upon by plaintiff to show misrepresentation by withholding of material facts are the same facts asserted by the Blakeslee-Rollins Corporation and C. W. Blakeslee & Sons in its claim with respect to the railway bridge contract. In his opinion denying recovery Judge Williams considered in detail allegations here advanced by plaintiff. We quote in full from his opinion beginning at page 245:
It is urged by plaintiffs that the consulting engineers, by reason of the fact that they had superintended the construction of the original canal, possessed superior knowledge as to the subsurface conditions throughout the area of the canal and knew that boulders large and small were distributed throughout the entire area, and that their recommendations that the core-boring *298 method be used in testing the subsurface conditions at the site of the work and that the caisson method be used in the construction of the piers were based on this superior knowledge, all of which, if made known to the plaintiffs, would have influenced their judgment to the extent that they would neither have submitted a bid nor undertaken to construct the main channel piers by the cofferdam method.
The proof does not support the claim that the consulting engineers of the defendant possessed superior knowledge as to the distribution of boulders throughout the area of the canal or at the site where the piers in question were constructed. They knew, of course, that boulders large and small were distributed throughout the entire area of the canal and that they might be encountered at any point in varying numbers and sizes. This knowledge was likewise in the possession of plaintiffs. One. of the officers of the plaintiff companies had been engaged in the vicinity of the proposed bridge in work similar to that called for in the present contract and in the construction of the old railroad bridge approximately 75 feet distant from the piers involved, and also in construction of other bridges at the Cape Cod Canal some distance from the site of the present work. The plaintiffs possessing the same knowledge in respect to the distribution of boulders throughout the area of the canal as that possessed by the consulting engineers of the defendant were therefore neither damaged nor misled by the failure of the contracting officer to inform them as to the recommendations made by the consulting engineers as to the methods that should be adopted in the performance of the work.
In respect to the contention that plaintiffs were misled by the failure of the defendant to inform them that dynamite was used to get by boulders while making the borings it need only be.pointed out that wash-boring maps show only the stratification of materials in various holes; shown on the plans and do not show the methods employed in getting the borings down. The method of making the borings and the fact that dynamite was used and similar information is recorded in the log book. Plaintiffs knew this but made no effort to consult the log book, which was available to them. Plaintiffs therefore have no one but themselves to blame for the fact that at the time they submitted their bid they did not know that dynamite had been used by the defendant in making the borings and cannot be heard to com *299 plain that they were misled or damaged by the defendant because of that fact.
The further contention that plaintiffs were misled by the failure of the contracting officer to inform them of the boulder difficulties then being encountered by a dredging contractor in widening and deepening the canal at another point is without merit. Plaintiffs knew that boulders were distributed throughout the entire area of the canal and were liable to be encountered at any point. This information if imparted would have added nothing to the knowledge already possessed by plaintiffs and would in no way have aided them in reaching a conclusion as to what the situation in respect to the presence of boulders might be in this case.
The court in the Blakeslee ease, supra, after careful analysis of the cases including the principal ones relied upon herein by plaintiff, reaffirmed the rule as stated in General Contracting Corporation v. United States, 88 C. Cls. 214, 248, reading:
* * * In order to sustain misrepresentation it must be proven that the defendant’s official made a boring and found a certain condition and did not register exactly what was found, but, on the contrary, registered a different condition from what the boring showed.
In the Blakeslee ease, supra, Judge Williams stated:
The defendant having furnished to plaintiffs all the information in its possession in respect to the subsurface conditions existing at the site of the piers, without misrepresentation or concealment in any respect, is not liable to plaintiffs for any loss incurred by them in the performance of the work.
There is no claim by plaintiff that defendant’s responsible officers failed to tabulate and make available all information revealed by the borings made at each of the sites of the main channel piers for the two highway bridges. Plaintiff and its subcontractor were informed in the specifications for the work which accompanied the invitation to bid that wash borings had been made under direction of the contracting officer and of the engineer at various points at the sites of the work and that dry samples of the materials obtained had been preserved and labeled. Plaintiff and its *300 subcontractor were experienced contractors and knew what the wash-boring method was. They were further informed in Article 34 of the specifications that borings apparently indicated that boulders might be encountered in varying numbers and sizes at any or all of the excavations to be made for the work and bidders were warned to take into account the possibility that conditions affecting the cost or quantities of work to be done might differ from those indicated.
It follows from the above that the portion of plaintiff’s claim based on misrepresentation by defendant of subsurface conditions must be denied.
Plaintiff further alleges that delays in the completion of the four main channel piers caused plaintiff a delay of 89 days in its efforts to complete the concrete superstructure work and that during all of this period it maintained three complete concrete units in its plant ready for work at an actual cost to it of $79,018.02, including a profit of 10 percent. It seeks to recover this amount on the theory that the delay was caused by subsurface conditions being other than those represented by responsible officers of the defendant. This claim must fall because it is predicated upon defendant’s liability for the delay by reason of misrepresentation and we have found there was no misrepresentation.
Plaintiff also contends that $1,000 was improperly deducted from payments made to it by the Government as liquidated damages for delay in the completion of the contract, the deduction having been made pursuant to the provisions of the contract with respect to liquidated damages. No evidence having been introduced to substantiate this allegation and no mention of it having been made in plaintiff’s brief, this claim is likewise denied.
The fourth claim by plaintiff is based on its relocation, at a cost of $1,272, of overhead electric lines existing at the beginning of the work in the vicinity of the Bourne and Sagamore channel piers. It is contended that the position of these lines made it physically necessary to move them before commencing the work and that such relocation was entirely outside the provisions of the contract. This *301 contention cannot be sustained for the reason that Article 10 of the specifications provides, inter alia: “* * * bids must include all expenses for extra work and difficulty incident to maintaining rail, highway and canal traffic during construction * * These power lines were being used in connection with the canal, and are therefore within the terms of this provision. This item in plaintiff’s claim is denied.
The fifth and final item of plaintiff’s claim is for $55,-785.02, the cost — including a reasonable profit of 10 percent — incurred by plaintiff in complying with orders given by defendant’s contracting officer and consulting engineers in an endeavor to eliminate a discoloration on the surface of the concrete called sand-streaking. Toward completion of the work under the contract the surface of the concrete exposed to public view was marred by still adhering sand, a result caused when there has been left on the surface a commixture of sand, cement, and water, the water has been removed or has evaporated, and the superficial cement, having become separated from the designed mixture, falls or is brushed away. The cause of this sand-streaking was not known to either party and the contracting officer and consulting engineers of defendant, with the hope of eliminating the condition, gave certain orders to plaintiff. First, the design of the concrete mix was ordered changed. The design being used for the concrete in question, Class B, was changed by the order to the design, proportions of which were tabulated in Article 503 of the specifications. The effect of this order was to require additional cement in the design of the mix at a cost to the plaintiff of $17,642.11. The supervising engineers of defendant also directed plaintiff to increase the time of mixing from a minimum of V-/% minutes to a minimum of 2 minutes, a change which entailed a cost to plaintiff of $14,659.32. A third order provided for a lower slump requirement in the mix and resulted in a cost to plaintiff of $12,137.10. Defendant’s engineers also tried to eliminate or reduce sand-streaking by making the pours of a lesser content. Plaintiff was accordingly directed to place additional construction joints in pylons of the abutments at a cost of $2,575.12. Finally, under the di *302 rections of defendant’s contracting officer, plaintiff was ordered to plaster the surface of tlie, pylons at a cost of $3,700. A reasonable profit of ten percent on the above cost figures is $5,071.37, making a total of $55,785.02.
Plaintiff contends that in complying with these orders made for the purpose of eliminating or reducing sand-streaking it performed extra work not authorized by the contract, plans and specifications. Article 506 of the specifications provides that for the pylons the forms should be surfaced with steel plates or other material which will produce an equally good surface, and that in addition, any areas indicated as “smooth surface” on the contract plans shall be constructed with such smooth-surface forms. Where smooth-surface forms are not required, lumber is specified. Article 507 provides for the method of treatment of concrete surfaces by rubbing with carborundum brick and water. The Government in these sections chose to procure a satisfactory surface appearance by specifying with detail the work to be done affecting concrete surfaces. The Government, if it desired, could have required that plaintiff produce a surface free from sand-streaking, an appearance not unusual in work of the character here involved. Not having done so defendant cannot complain when, without fault of plaintiff, compliance with the. detailed specifications prepared by defendant fails to produce the desired result. There is no claim by defendant or any evidence of plaintiff’s failure to comply with the specifications in Articles 506 and 507.
Examination of the contract, plans, and specifications fails to reveal any provision authorizing the making of these orders for the purpose of eliminating or reducing sand-streaking. Under Articles 502 and 508 of the specifications, it is true that officers of defendant could have increased the content of the cement in the mix, lowered the slump requirement, and increased the mixing time to 2 minutes — as was done by the orders here in question — without exceeding in any case maximum requirements fixed by the contract. However, these orders could be made under the provisions only for the purpose of improving the strength or “workability” of the mix. The, orders were made to eliminate *303 sand-streaking, a matter of appearance not affecting the strength or “workability.” In respect to the order requiring additional construction joints the contract maximum was exceeded in that Article 506 calls for a fixed number of joints by specifying that the joints shall be spaced at fixed distances. Article. 507 expressly states that “no grout or mortar shall be used” on exposed surfaces. Nevertheless, plaintiff was required to plaster the surface of the pylons with a mixture of sand and cement.
(Decided March 3, 1941)
Mr. Mark W. Norman for the plaintiff. Mr. Raymond E. Eackett was on the brief.
Mr. Assistant Attorney General Francis M. Shea for the defendant. Messrs. George F. Foley and Rawlings Ragland were on the brief.
Plaintiff is entitled to recover $5£t?8#t93 (see below), a sum composed of the cost of complying with orders given by defendant in endeavoring to secui-e a surface free from sand-streaking and a reasonable profit of 10 per cent thereon. All other items of plaintiff’s claim must be denied.
It is so ordered.
Littleton, Judge; and Green, Judge, concur.
Whitaker, Judge, took no part in the decision of this case.
ON MOTION FOR NEW TRIAL
Whaley, Chief Justice, delivered the opinion of the court:
The defendant moves for a new trial alleging, as errors of law, first, that the court erred as a matter of lawr in rendering judgment for plaintiff on the fifth item of its claim in an amount in excess of that claimed and prayed for in plaintiff’s petition; second, that the court erred as a matter of law in failing to give effect to the release which plaintiff executed on December 24,1934; third, that the court erred as a matter *304 of law in holding that plaintiff was entitled to any recovery based on the contracting officer’s direction to plaintiff
to use the proportion tabulated in Clause 403 (meaning Article 503) of the specifications of 1 unit by volume of cement to 6y2 units of aggregate.
The first and second assignments of error will be considered together, as one is a corollary to the other. If the second assignment is valid, the first assignment would also fall into this classification.
The second allegation is the material point to be considered. Plaintiff entered into a contract containing a provision known as Article 16 (d), which required, as a condition precedent to payment of any amount still due the contractor after completion and acceptance of the work, a release
of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.
Pursuant to this provision, on December 24, 1934, plaintiff executed a release, excepting, among other things, item five thereof as follows:
* * * a further claim in the amount of $48,534.53 on account of increased labor performed and material furnished in the mixing and placing of concrete because of the requirements of the contracting officer with respect thereto.
This provision of the release specifically sets out the claim and the amount of the claim. In the taking of the evidence, no opposition was made to the introduction of testimony for a larger amount for item five and no exceptions were taken to the commissioner’s report in which there was a finding that the plaintiff’s costs on item five totalled to an increased amount. Defendant failed to make any point or defense of this item in its brief.
The provision of the release in question was overlooked by the court in the consideration of the case owing to the fact that this clause in the release was not called to its attention by the defendant. It is an unusual provision and has not appeared in any other contract which the court has had to *305 ■construe. Under its terms the defendant had the express right to require the plaintiff to state the item of its reservation and the amount it claimed as extra costs. When the release was executed, reserving only this amount as the cost of the extra work, all other amounts over and above this amount were released. It follows that plaintiff is bound by this release in the amount specified and is limited in its reservation on this specific claim to the sum of $48,534.53.
The above view on the second allegation makes unnecessary -consideration of defendant’s first assignment of error.
In its third assignment of error defendant alleges that its ■order of May 8, 1934, did not require plaintiff to furnish cement in excess of that required by the contract but merely to furnish that called for in the express terms of the specifications, namely, “1 unit by volume of cement to 6y2 units of aggregate.” It must be borne in mind that the work performed by the plaintiff in eradicating sand-streaking was not work within the terms of the specifications or the contract but excess work required by the contractor. It will be ■seen after an examination of the provisions of the specifications that the ratio of cement to aggregate mentioned by the -defendant was not the only ratio provided for in the specifications. Under the terms of Article 503, the cement in 'Class B concrete could be decreased or increased by the contracting officer 15 percent from the proportion fixed in “1 unit by volume of cement to 6% units of aggregate.” Plaintiff under the express directions of defendant on and prior to -the order of May 8, 1934, used the minimum amount of •cement fixed by the specifications. The express terms of Article 503 required all changes by defendant in the aggregate to be for the purpose of governing the. workability or strength of the mix. The extra work required under the ■orders of the contracting officer for the elimination of sand-streaking had nothing to do with the workability or the ■.strength of the mix but was solely for appearance. Therefore, the order of May 8, 1934, which required additional cement content over the minimum was outside of the contract for the reason that it only affected the elimination of the sand-streaking and not workability. There was no error of law in holding that plaintiff was entitled to the extra costs in *306 curred in the elimination of sand-streaking. This third ground for a new trial is overruled.
The motion for a new trial is sustained as to the second allegation and is denied as to the other two allegations.
The former judgment is vacated and withdrawn and judgment now entered for the plaintiff in the sum of $48,534.53 in accordance with this opinion. The former findings and opinion will stand. It is so ordered.
Littleton, Judge; and Green, Judge, concur.
Whitaker, Judge, took no part in the decision of this motion.