Whaley, Chief Justice,
delivered the opinion of the court:
The plaintiffs jointly and severally entered into a contract with the United States, through the Assistant Administrator of the Federal Emergency Administration of Public Works, to furnish the materials and perform the work for the construction of the superstructure, including the electrical overhead and underground distribution system, included by “General Work for Base Bid No. 6” for the Brewster Housing Project, No. H-1201, in Detroit, Michigan, in strict accordance with the specifications, schedules, and drawings, for the consideration of $2,971,000.
This housing project consisted of 38 buildings and occupied 7 city blocks in the city of Detroit. On four of the blocks the excavation for and construction of the foundations had been performed by another contractor before the contract with the plaintiffs was entered into. In three other blocks the plaintiffs were to excavate for and construct the foundations and to construct the buildings on the foundations on all of the blocks.
The project was to be completed within 410 calendar days after notice to proceed. The notice was given to plaintiffs on June 25, 1937, which fixed the completion date as August 9,1938, which change orders extended to September 5,1938.
The project was completed on August 11, 1938, 26 days before the completion date as extended. The plaintiffs were paid the sum of $3,001,090.76, which was the contract price plus certain charges which were agreed to by change orders. The plaintiffs executed a release to the defendant excepting in the release two claims for additional payment — (1) for increased cost, loss and damage resulting from heating and steam mains not being located as shown on specifications and drawings and change from heating buildings by heat from the Detroit Edison Compan 7/ to a central heating plant in the sum of $48,000.00; and (2) for reimbursement for money which plaintiffs were required to pay because of charges against site of -work by Public Water Works System of the City of Detroit in the sum of $5,077.41.
*160 Plaintiffs seek to recover a muck larger sum in the petition but, having reserved only these two items and stated these several amounts, they are confined to only these specified items and amounts. P. J. Carlin Construction Co. v. United States, 92 C. Cls. 280, 305.
The first item involves the extra costs plaintiffs incurred in furnishing temporary heat. The whole plan as depicted in the contract, drawings, and specifications was conceived and based on the use of steam heat to be furnished by the Detroit Edison Company. This company had mains, vaults, and pipes laid in certain streets in the city of Detroit and furnished steam for the purpose of heating buildings. It was the intention of the defendant to use this system of heating in this project. All the plans, drawings, and specifications specifically show that plaintiffs’ contract was to cover only the plumbing that would connect with this system. The drawings show that a main was in the street adjacent to the project. The contract definitely states that the contractor is to construct a meter vault to this system after it has been brought into the ground of the project and the specifications state
Steam for the heating system will be supplied from the mains of the Detroit Edison Company * * *. Steam service piping will be brought by the Detroit Edison Co. to the point indicated in the meter vault indicated on block 500. The Contractor shall furnish the meter vault, and continue the piping underground to all the buildings * * *.
And the specifications further state
Steam for the heating system will be supplied from the source shown on the drawings, * * *.
The contract drawings plainly show a 14-inch main of the Detroit Edison Company in the street adjacent to the project running into the company’s valve pit in the street and from this main steam was to be brought by a 12-inch pipe into a meter vault on the premises and at a short distance therefrom connected with the Government’s steam main feeding the radiation system.
An investigation or inspection of the site would not have helped the plaintiffs. Had they discovered that the main *161 of the Detroit Edison Company was not on the street adjacent to the project that would not have prevented the Detroit Edison Company from erecting the main and bringing its facilities to the property by the time the plaintiffs were ready to make the connections inside the property. When the note on the drawings showed “14" Detroit Edison Co. Main,” it was a reasonable presumption that were the main not there it would be there at the proper time. There are other notes on the drawings such as “D. E. Co. Terminates Steam Main here,” and “Contr. Connects to D. E. Co. Main here.” All these notes gave notice to the plaintiffs that the facilities of the Detroit Edison Company would be available when the connections had been made inside the project for the temporary heat which plaintiffs were to furnish. No examination or inspection of the site would have shown that situation.
Plaintiffs’ work was confined to the distribution of the heating and the connection with the Detroit Edison Company’s main. A permanent heating system, independent of the Edison Company’s is not mentioned in the contract, drawings, or specifications.
Under the instructions to bidders the specifications do provide that bidders are to make their own estimate of the facilities attending the execution of the proposed contract and are notified to visit the site to fully acquaint themselves with conditions as they exist, but, even without these instructions, a bidder looking at the drawings would have come to the conclusion that the main of the Edison Company’s system of heating was adjacent to the project or would be brought to the place marked on the map showing it adjacent to the project.
Before the contract was executed plaintiffs knew that the defendant was negotiating with the Detroit Edison Company for the use of its heating system in the project and plaintiffs subsequently sought terms with this company for the temporary heating.
The defendant and the Detroit Edison Company could not arrive at a satisfactory contract with the result that the defendant changed the plans for the heating system by installing its own plant.
*162 The contract for the erection of this plant was given to another company but plaintiffs were given a change order for the installation of return pipe lines. The Detroit-Edison system did not use return pipe lines. The change of the plans of the heating system radically changed the basis on which both parties had contracted. Both believed that the heat could be obtained from the Detroit Edison Company. The defendant based the entire project heating lay-out and advertised for bids with the specifications and drawings based on obtaining heat from the Detroit Edison Company.
The plaintiffs made their bid, executed the contract and went to work relying on these statements. They were justified in making their bid with the understanding that temporary heat could and would be obtained from the Detroit Edison Company and that they would not be required to construct an independent heating plant.
If the bidders were not so justified, it is plain that in a project of this magnitude they would have had to bid that much higher, resulting, in the event that a hook-up with the Edison system became an accomplished fact, in unearned profit to themselves and a corresponding inexcusable loss to the Government. It is to be noted that the Government did not ask for alternative bids.
The contract provides under “Temporary Heating”:
1. The Contractor shall provide temporary heating, covering, and enclosures as necessary and to the satisfaction of the Contracting Officer to protect all work and material against damage by dampness and cold. * * *
2. The Contractor shall supply such heating equipment as may be required and/or he may utilize with the approval of the Contracting Officer the heating equipment to he installed, u/nder the Contract Documents, or such portions thereof as are ready and available, provided that he shall leave the same in proper and acceptable condition upon completion of the work. Salamanders or other open fires will not be permitted in the buildings after the buildings have been enclosed. * * * [Italics ours.]
This section of the specifications permits plaintiffs to elect whether they will erect their own temporary heating plant *163 or use the Detroit Edison Company’s heating system. That system was the only one mentioned under the contract documents. The prohibition against the use of open fires or salamanders, combined with the fact that the heating system for the project did not provide for return pipes which are necessary for an independent heating system, necessarily forced the plaintiffs to rely on the temporary heat to be obtained from the Detroit Edison Company.
The defendant and the Detroit Edison Company were unable to agree on a fair and reasonable contract for the supply of heat to the project and the plaintiffs endeavored to procure temporary heat from the Detroit Edison Company but the price was prohibitive. The revenue which would have been derived from furnishing temporary heat did not justify the capital investment which the extension of the heating system to the location adjacent to the property would have necessitated. The Government having failed to make a contract for permanent heat, the Detroit Edison Company would not extend their system opposite the project unless the contractor would pay a revenue for the temporary heat which would cover the capital investment.
After the plans of the Government were changed so as to provide an independent heating system for the project and the plaintiffs were unable to procure temporary heat from the Detroit Edison Company, they were forced to erect their own temporary heating plant at a heavy extra outlay and now seek to recover the difference between the cost of this temporary heating plant and what it would have cost to provide temporary heat from the Detroit Edison Company under the original plans.
The positive statements in the contract as to the source from which heat was to be procured must be taken as true and binding upon the Government and loss resulting from the mistaken representation of an essential condition should fall upon the defendant rather than upon the plaintiffs even though there are provisions in other paragraphs of the contract requiring the contractor to make independent investigations of facts. Hollerbach v. United, States, 233 U. S. 165.
Plaintiffs are entitled to recover the extra cost caused by the defendant’s change in the contract.
*164 Plaintiffs expended for salamanders $321.88 and for labor $3,960.09, making a total of $4,281.92; for the erection and demolition of the temporary heating plant, including labor, etc., as shown in Finding 22, the sum of $23,896.71; and on the operation of this temporary plant, including fuel, labor, etc., as shown in Finding 22, the total sum of $18,689.22.
The combined costs of temporary heat were $46,867.85 from which must be deducted the cost which the Edison Company would have charged for temporary heat, viz, $32,142, leaving a balance of $14,725.85. This sum the plaintiffs are entitled to recover.
The second claim is for back charges plaintiffs were forced to pay before the Water Department of the City of Detroit would issue permits to connect with the water supply. When the property was cleared the Water Board had removed and capped the old water stubs and charged against the property for this work the sum of $5,077.40.
When application was made by the plaintiffs for permits to make the water connections with the buildings the Water Board refused to issue permits unless these back charges were paid. In order to proceed with the work plaintiffs paid this sum under protest in addition to the charges for the permits. When plaintiffs were notified of the refusal of the Water Board to issue permits until these back charges had been discharged, they called upon the defendant to clear this indebtedness. The defendant ruled under the contract that plaintiffs were obligated to pay this sum. This ruling upon appeal was affirmed by the head of the Housing Authority.
The contract provides under the heading of “Permits”:
1. The contractor shall, without additional expense to the Government, obtain all required licenses, permits, certificates, etc., for work outside the Government’s property lines, relating to the use of streets and sidewalks, the protection of public traffic, connections to utility service lines, etc. The Contractor will not be required to obtain building or other permits for work inside the Government’s property lines.
2. The Contractor is cautioned, however, that when it is his responsibility to make connections to City and other Utility Lines, the fact that the Government does not require the obtaining of permits for work inside the Government’s property lines, does not excuse the Con *165 tractor from doing all things required by the City or Utility Company controlling said lines as a condition precedent to the granting of permission to tie into the lines.
In Addendum No. 2 it is provided:
The contractor shall provide and/or arrange with the Detroit Water Board to provide the required water service piping, shut off boxes, valves, meters and meter installation as indicated on the drawings and in accordance with the Detroit Water Board standards, and shall pay all costs in connection therewith.
These sections apply to permits and charges which are necessary to be procured and paid after the contract was entered into and have no application whatsoever to charges which were incurred or charged against the property while cleaning the site or for any other reason. It was the defendant’s responsibility to clear the site and these back charges had no connection whatsoever with obtaining the permits, etc., for the work which plaintiffs had contracted to perform. They constituted an indebtedness against the property and not an obligation undertaken in the contract. When the contracting officer and the head of the department ruled that plaintiffs had to discharge these back charges it was a misinterpretation and wrongful construction of the contract provisions. Plaintiffs are entitled to recover $5,077.40 on this claim.
The decisions of the contracting officer and the head of the department on appeal on both issues were so grossly erroneous that they should be set aside as amounting to bad faith.
Plaintiffs are entitled to recover $19,803.25.
It is so ordered.
Whitaker, Judge, and Littleton, Judge, concur.