son of this re-fractured femur. However, this court is of the opinion that since the evidence of that loss of income is indefinite, but leaves that loss of income to be estimated by the court, this court has no measure by which to estimate that loss. There is no doubt in the court's mind that plaintiff sustained loss of income, but there is no way for the court to fix that amount and the court is of the opinion that it cannot speculate or estimate it. Consequently, no sum can be fixed and nothing can be allowed for loss of income.

Plaintiff has also claimed an expert witness fee of $150 and, upon the day of the oral argument of the case, presented the bill to the court. The bill was not presented in evidence at the time of the trial of the case, and was not testified to by any witness at that time. Consequently, it must be disallowed.

However, as to the damages for disability and pain and suffering sustained as a result of this accident, the medical testimony in this case is much clearer than in the average case, for the doctor has clearly specified the distinction between the damage of the original fracture and the damage caused by this re-fracture, and by reason of the complete healing of the original fracture, leaving no disability, X-rays of the re-fracture caused by this accident which did leave certain disability, this court is able to determine with certainty the extent of permanent injury resulting from the accident in this case. The court is able to determine the length of time that it was necessary for the plaintiff to have his leg in cast; the period of permanent and partial disability, and the pain and suffering caused in this case, as well as the extent of his recovery from the second accident and the extent of the permanent injury to the knee.

■ The court has considered all of the testimony very carefully and is of the opinion that the fair measure of the plaintiff's damages for temporary disability, and pain and suffering, together with permanent injury should be assessed at the sum of $10,000. Also, as a result of this accident plaintiff has sustained damages in the sum of $1,183 as out of pocket doctor's bills, or a total of $11,183 as damages.

■ Under the statute in this jurisdiction allowing the Court to fix attorneys' fees, the Court also feels that $1,500 is a reasonable attorney's fee in this instance and, therefore, is part of the costs herein.

Judgment therefore should be for the sum of $11,183, plus $1,500 attorneys' fees, or a total of $12,683, together with the filing costs of the action.

Order may be drawn in accordance therewith.

**A. L. COUPE CONSTRUCTION CO., Inc., A. L. Coupe and E. G. Barker, Partners and Coadventurers, and Citizens Union National Bank of Louisville, Kentucky,**

v.

**The UNITED STATES.**

No. 50276.

United States Court of Claims.
March 6, 1956.

Robert Sheriffs Moss, Washington, D. C., for plaintiff. Bailey Walsh, Memphis, Tenn., and Ralph E. Becker, Washington, D. C., were on the briefs.

Paris T. Houston, Washington, D. C., and Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This action is brought by plaintiff [1] to recover damages for an alleged breach of the express and implied provisions of a contract to construct housing facilities for defendant at Oak Ridge, Tennessee, in 1943 and 1944.

Plaintiff bases its claims upon allegations that (1) defendant failed to stockpile lumber in the required sizes and quantities needed at a single location at or near the site of the work; (2) defendant interfered with plaintiff in the hiring and recruiting of labor; (3) defendant failed to construct and maintain adequate roads in the vicinity of the work; and (4) for the return of amounts deducted from the contract price for lodging plaintiff's employees.

Defendant denies any liability for losses on account of unavailability of lumber, recruitment of labor, or condition of the roads and asserts a legal right to the sum deducted for housing plaintiff's employees. In addition, defendant asserts that the claims in suit were released by plaintiff upon completion of the work, and that plaintiff has not shown that it suffered any damage due to any actions of defendant.

The questions presented are: (1) whether plaintiff has released defendant from the claims asserted in this suit; (2) whether plaintiff suffered any unrecovered loss due to the lack of all the lum-

1. Plaintiffs, operating as a partnership, will be referred to as plaintiff.

ber at a single location in the sizes and quantities required and, if so, whether defendant is liable therefor; (3) whether the roads on the site of the work were different from what plaintiff should have contemplated and, if so, whether it suffered any loss and damages by reason thereof and whether defendant may be held liable for any of it; (4) whether the conditions controlling the hiring and recruitment of labor for the work were different from that which plaintiff expected or should have expected before the award of the contract and, if so, whether defendant is liable for any loss suffered thereby; (5) whether plaintiff's losses on the contract in connection with any particular conditions or actions of plaintiff or defendant can be ascertained and separated in order to determine the amounts, if any, due as damages; (6) whether defendant is entitled to retain moneys assessed and withheld from plaintiff's contract pay or collected from plaintiff for the cost of lodgings for plaintiff's employees.

In this posture of the case, the first question to be passed upon is the assertion of defendant that all the claims in suit, except the hutment claim, have been released.

After the completion of the work and during the latter part of 1944, plaintiff filed claims with defendant for additional compensation in connection with its work under the contract. On March 5, 1945, a formal claim asserting 10 itemized claims in the total amount of $72,543 was filed. On March 17, 1945, a final payment voucher in the amount of $73,437.16, covering monthly pay estimate No. 10 and marked "final" was sent to plaintiff with the request that the certificate of the payee thereon be executed along with a release, as required by the contract, and returned to defendant in order that final payment may be made. Previously plaintiff had been requested to execute a release with the advice that the final pay estimate was being prepared and the release would be required in connection therewith. Mr. A. L. Coupe complied with the request and signed and submitted to defendant a release along with pay estimate No. 10. Payment on the estimate was made on April 2, 1945. No retained percentages were withheld from this estimate for the purpose of keeping the contract open. The release, in pertinent part, is as follows:

> "Release
> "Approved by the Under Secretary of War March 22, 1941
> "The work under contract number W–7421–Eng–4 dated 11–16–43 between the United States of America, represented by E. H. Marsden, Col., Corps of Engineers, as Contracting Officer, and the undersigned contractor, having been completed and finally accepted, the United States, its officers and agents, are hereby released from all claims and demands whatsoever arising under or by virtue of said contract, except as follows:
> "See list attached.
> "Executed this 24th day of March 1945.
>
> > "Coupe Construction,
> > (Contractor)
> > "By A. L. Coupe [s],
> > (Official Title)
> > *Partner.*"

Subsequently the contracting officer allowed the claims as listed in items 4, 5, and 6 of the specifications, and on appeal the head of the department allowed items 1, 2 and 3, and payments thereon have been made to plaintiff in the total amount of $16,156.54. The claims set out in items 7, 8, and 10 of the specifications were denied by the contracting officer and the head of the department. Item 9 of the claim for hutment charges was allowed to the extent that it was found that the hutment services were not part of the construction contract and the deductions thereon could not be made from the construction contract. Item 7 of the claim was denied by the head of the department on the grounds that the invitation to bid was not an offer to sell lumber to plaintiff at the prices stated therein, but was merely for the purpose of evalu-

ating bids and that the price for such lumber sold must be determined by other standards of value and pricing. Item 8 of the claim was denied on the grounds that the contract had provided for extensions of time, but not for damages for delays due to any delay in the receipt of materials, equipment, or supplies to be furnished by the Government. Item 10 of the claim was denied on the grounds that plaintiff failed to establish proof of any basis for the claim. The board observed that the record before it showed each change order allowed additional sums based upon amounts requested by the contractor, or amounts arrived at after negotiations, and there was included in such amounts items of ten percent for overhead and ten percent in addition for profit, and further, the record showed no reservation of additional claims in connection with overhead. Plaintiff now says that the release above-quoted was without force and effect because it was not signed by the general partner, A. L. Coupe Construction Company, Inc., but by A. L. Coupe, one of the special partners.

On November 13, 1943, the board of directors of the A. L. Coupe Construction Company, Inc., adopted a resolution which "authorized, empowered, and directed" Mr. Mueller to "execute all contracts, letter contracts and other papers, and do all things and perform all acts necessary or incident thereto" in connection with construction at Oak Ridge. The form for signature was specified as "Coupe Construction, by A. L. Coupe Construction Company, Inc.—General Partner, by—C. W. Mueller, Vice President." However, this instruction appears to have been almost completely ignored.

■ Mr. Coupe was not only one of the limited partners, but also was president of the general partner, the corporation, and as such was the individual and practical control of the partnership operations. It is true that by the laws of Kentucky, under which the partnership was formed, and by the articles of partnership, the limited partners were without authority to sign for the partnership and such authority was vested only in the general partner. While Mr. Mueller was project engineer authorized to act for the managing partner and did so act at times, the record discloses that it was almost the uniform practice of the partnership in signing various documents, including the acceptance of change orders, to disregard the stated requirement and omit the designation of the corporation general partner as signatory thereto. Neither Mr. Coupe nor Mr. Mueller appeared to have used the name of the corporation which was the managing partner in connection with their signatures on any letters.

The plaintiffs in this suit joined in a partnership to do business under the partnership name of "Coupe Construction." That name was used to accept the contract here involved. It was used to accept the nine change orders to the contract. It was used to submit the various claims and all other correspondence to defendant. All official acts of the partnership were performed in the name of "Coupe Construction." The partnership business stationery was printed with the heading "Coupe Construction." The release was executed in the name of "Coupe Construction." It cannot be denied and is apparently conceded that "Coupe Construction" was the proper party to sign the contract and the release required by it. However, plaintiff says that Mr. Coupe had no authority to bind Coupe Construction in such a release and that Mr. Coupe signed as a partner and not as an official of the A. L. Coupe Construction Company, Inc., the managing partner.

■ The partnership agreement provided that the corporation as managing partner should devote its entire resources and personnel to the business of the partnership insofar as necessary, but that the special partners should take no part in the management of the business or transact any business for the partnership or sign for it or bind it. Mr. A. L. Coupe was not only one of the special partners, but also was the president of

the corporation which was the managing partner. He knew he lacked authority as special partner to bind the partnership and from the facts in this case, it must be presumed that when he took official action in connection with the contract he acted as a representative of the corporation, which was the managing partner, and not for himself as a special partner. If Mr. Coupe signed as a special partner there could be no doubt that his signature in that capacity, under the Kentucky law, could not bind the partnership. However, when he signed "Coupe Construction—by A. L. Coupe, partner" it must be presumed that he signed in a lawful capacity, in the absence of evidence to the contrary. President, Directors & Co. of Bank of United States v. Dandridge, 12 Wheat. 64, 69, 70, 25 U.S. 64, 69, 70, 6 L.Ed. 552; Klamath and Moadoc Tribes v. United States, 296 U.S. 244, 253, 56 S.Ct. 212, 80 L.Ed. 202; Bank of Kentucky v. Adams Express Co., 93 U.S. 174, 181, 23 L.Ed. 872; Mitchell v. United States, 21 Wall. 350, 353, 22 L. Ed. 584.

■ Thus, we conclude that the release is valid and binding upon plaintiff. The question then arises as to which claims in the suit were set out in the exceptions to the release, the rule being that claims not set out in an exception are released and cannot be sued upon. P. J. Carlin Const. Co. v. United States, 92 Ct.Cl. 280, 305.

Article 16 of the contract, entitled "Payments to contractor," provides in pertinent part as follows:

" * * * (d) Upon completion and acceptance of all work required hereunder, the amount due the Contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein."

There were 10 exceptions. Subsequently the contracting officer paid Nos. 4, 5, and 6 and the head of the department paid Nos. 1, 2, and 3. Items 7 and 10 were denied by the contracting officer, but are not included in this case. Item 8 is for "additional costs incurred in transporting and handling lumber requirements," and would come under the claim in the petition that the Government failed to stockpile lumber in a single site and thereby breached the contract. Item 9 is for credit for hutment charges— amounts withheld on contract settlements and paid to Roane-Anderson Company.

■ Thus, items 8 and 9 are the only claims in this suit which were saved by plaintiff's exceptions to its release and are limited not only by the subject matter of the release and exceptions thereto, but also by the amounts set out in the exceptions. See Shepherd v. United States, 113 F.Supp. 648, 125 Ct.Cl. 724, 741; Bein v. United States, 101 Ct.Cl. 144; Eastern Contracting Co. v. United States, 97 Ct.Cl. 341; P. J. Carlin Const. Co. v. United States, 92 Ct.Cl. 280; United States v. William Cramp & Sons, 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983; Pelton Water Wheel Co. v. United States, 55 Ct.Cl. 31; Hartsville Oil Mill v. United States, 60 Ct.Cl. 712, and Eppes v. United States, 62 Ct.Cl. 645.

Two questions are presented under plaintiff's claim for damages due to defendant's failure to stockpile lumber in a single site. First, did defendant breach the contract in that respect; and second, if so, did plaintiff suffer damage which can be ascertained.

A summary of the facts in relation to the lumber claim, is as follows. The lumber requirements for the Manhattan District were submitted to the Army Corps of Engineers who centrally procured lumber. Set forth in the requests would be the quantities, general sizes, and species of lumber required. The Corps of

Engineers then placed orders for the lumber as requested. At times the mills became late in their shipment schedules and Stone and Webster, the managing contractor, pursuant to authority granted, procured lumber by direct purchase from any sources found available. In such cases procurement costs were higher to defendant. In addition to this, standing timber on the townsite was cut, a sawmill was established at the site, and lumber was fabricated from the logs and installed in the various houses and projects then under construction. In addition, Stone and Webster, pursuant to authority, fabricated smaller sizes of lumber from larger sizes when required. For example, 2" x 4"s would be ripped from 2" x 8"s. Lumber was in short supply and was secured from whatever source found available. Five million board-feet of lumber had been secured from the timbers in an ore dock at Mesabe Range and usable lengths and sizes fabricated therefrom. It was difficult to get adequate lumber in the required sizes and quantities, but the procurement policies and the organizations in question made it possible within a few hours to get lumber in the area when urgent. Seasoned lumber was sought but was not always obtainable and the shipments usually arrived in random lengths, requiring cutting and wastage. The 4,242,800 board-feet of lumber used by plaintiff in the construction of the housing required by the contract was approximately five percent of the total amount of lumber handled at Oak Ridge during the same period. The lumberyards there were the largest in the Nation. At one time as much as 10,000,000 board-feet of lumber was on hand.

Before plaintiff accepted the contract it had performed housing construction work for the Government in other areas, particularly in Kentucky and Indiana. At those places the operations had been carried on through the process of establishment of a central point for the fabrication of lumber and through construction by specialized crews moving from one building to the next in sequence.

Plaintiff expected to use the same procedure on the contract at Oak Ridge. However, no mention was made of such plans to defendant's agents and representatives prior to the time of the award of the contract or at any time during performance.

At the time plaintiff's representatives visited the site preparatory to bidding, the several lumberyards were in operation in Oak Ridge and were being used by other contractors. After the contract was awarded and after the letter contract was submitted, Mr. Coupe was orally advised by a representative of Stone and Webster, the managing contractor for the Government, that lumber would be secured for the construction of the housing project from the lumberyard for Townsite No. 3 and the location thereof was pointed out. On November 18, 1943, this representative of Stone and Webster wrote plaintiff that the lumber requirements for the housing project to be undertaken by plaintiff would be secured from Townsite Lumberyard No. 3 and set out certain procedures to be followed in handling the lumber, including a requirement that requisitions be made for lumber needed in ample time to permit the materialmen to verify the lumber as available. The letter further stated that it was intended that such quantities of lumber as requested would be available but in case a deficiency in some item was anticipated, plaintiff should contact a Mr. Morgan of Division 4.

Plaintiff did use the lumberyard at Townsite No. 3 but at times it was necessary for it to procure lumber from other yards in the area. The supply of lumber was never depleted on the project but at times the required sizes, shapes and lengths were not present and it was necessary for Stone and Webster to fabricate the lumber in the sizes needed from other available sizes. When lumber of longer lengths than was needed was furnished, plaintiff's project was not charged with the additional length. The additional lengths did not cause plaintiff any inconvenience because it was necessary to cut off the ends in order

to square them even when the lumber submitted was of the required lengths. Thus, it was no more difficult to cut off the longer lengths in the squaring process than to cut off the smaller lengths for the same reason.

Plaintiff was not delayed for the lack of lumber and only one specific delay was shown which was as long as one day when it was impossible to get lumber of a tongue-and-groove variety for roofing. In that case, plaintiff was permitted to proceed by using square-edge lumber instead of the tongue-and-groove.

Defendant made every effort to provide plaintiff with lumber under very trying circumstances. Cost was not spared in this effort. There was no hesitancy on anyone's part to fabricate smaller sizes from larger sizes or to sacrifice longer pieces in order to provide requirements in shorter lengths. The operations of the lumberyards were so organized that the smaller yards could requisition their requirements from the larger central yard as the need arose. For this reason the contractors were requested to submit orders sufficiently in advance to permit such requisition. If due to lack of notice by a contractor it was impossible to fill such an order when the contractor's truck arrived, then whatever lumber was available in the smaller yard was furnished or the truck would proceed to the general lumberyard or some other yard where it was available. However, at all times when sufficient advanced warning was given of lumber requirements, Townsite Lumberyard No. 3 could cut lumber to order to fill a requisition if the proper sizes were not available or could bring in the required sizes and quantity from the general yard. It is good construction practice to submit orders for lumber sufficiently in advance to facilitate the filling of them on schedule. Plaintiff followed this practice at times, but at other times its trucks were sent to the lumberyard with the expectancy that orders would be filled immediately without proper advance warning. This faulty procedure was at times responsible for any delays the contractor had in the receipt of lumber.

Plaintiff was furnished an area for its office and storage buildings and for a storage yard. It could have established a central lumber fabricating operation at that point if it had so desired. Plaintiff never requested permission to set up a central fabricating plant at any of the lumberyards or at its own area. It could have established such a plant in its own area without permission to do so from anyone. Some of the other contractors did establish such plants in their own areas. Plaintiff did not at any time before the letting of the contract or during the course of the job complain that lumber was not being stored properly for it or that a central place for fabrication was not established, permitted, or available.

During the course of the construction work, plaintiff was furnished some green and otherwise defective lumber. Such was installed in the buildings and plaintiff was required to remove and replace it. It submitted a request for additional compensation therefor in the amount of $14,822.18 and was paid in that amount by change order No. 7 on September 30, 1944. The change order was accepted by plaintiff without protest. In this change order the costs to plaintiff were itemized and the additional amount of lumber used was noted. The change order also credited plaintiff with the additional lumber used.

Any delay occasioned to plaintiff's construction work due to the unavailability of lumber was by reason of its failure to request the lumber sufficiently in advance to permit defendant to fabricate the required sizes from larger pieces. Some of this fabrication was done by plaintiff and change order No. 7 allowed full compensation for all extra work and all expenses in connection with it. The relative priority for the entire project was high, but the priority assigned the housing construction was only AA–2X and not sufficiently high to have first call on lumber supplies available. Defendant

exercised due care and diligence in securing lumber for the project and the unavailability of the proper sizes, lengths and kind of lumber for the housing project at all times was not due to any fault and negligence of defendant.

The specifications relating to the stockpiling of lumber and delays by reason of failure to deliver materials to be furnished by the Government provide as follows:

"2–04 *Materials Furnished by the Government:*

"*a.* Lumber in grades indicated in the Form of Bid has been or will be procured by the Contracting Officer, and will be stockpiled for the use of the Contractor at the site. Each bidder will submit with his bid a statement of his lumber requirements for each type of building. Lumber up to the amount stated in the successful bidder's proposal will be issued to him without charge at the above designated stockpile. Transportation and handling charges thereafter will be at the expense of the Contractor. Lumber required by the Contractor in excess of that issued from stockpile or for items not listed is to be furnished by him at his own expense. For purpose of evaluating and comparing bids, prices indicated in the tabulation included in the Form of Bid will be used. The value of the lumber, thus computed, will not become a part of the contract consideration.

\* \* \* \* \* \*

"2–05 *Commencement, Prosecution, and Completion:*

\* \* \* \* \* \*

"*c.* If the completion of the undertaking to be performed under the terms of this contract be delayed by reason of delay in delivery of materials, equipment, or supplies to be furnished by the Government and which are essential to such performance, such delay shall not constitute basis for any claim against the Government, but the time of perform-

ance will be extended for a period equal to such delay."

From the foregoing paragraph 2–05 (c) it is apparent that plaintiff was warned that there might be delays in furnishing material by the Government and, if so, plaintiff's time for completion would be extended but such delay would not constitute the basis for a compensation claim.

The facts show that at the time plaintiff's representatives visited the site, preparatory to filing a bid, several lumber yards were in operation in Oak Ridge. They were being used by the various contractors, both fixed price and cost plus, as a source of lumber furnished by the Government. The record does not show what notice, if any, was taken of such lumberyards by plaintiff's representatives or whether any inquiry was made by them concerning the source or manner of furnishing lumber to the project under consideration prior to the bid.

On November 18, 1943, the plaintiff was informed by letter that lumber requirements would be withdrawn from a certain lumberyard and in fact lumber was secured from that yard. However, plaintiff contends that the lumber should have been stockpiled and ready in advance so there would be no delay in securing the lumber as needed.

■ Because of the magnitude of the project then under construction, it was impossible for the Government to keep on hand all the sizes and quantities required. In order to avoid all possible delays, the Government requested that orders be sent in ahead of time. At all times, if sufficient advance warning was given, lumber was cut to size and available to plaintiff for use on the job. Any delays were due to plaintiff's failure to order lumber in advance. Inasmuch as the contract contains no provision for advance stockpiling, we can find no negligence on the part of the Government in this practice, nor does this constitute a breach of the contract. Plaintiff's claim must therefore fail as to this item.

We then turn to plaintiff's claim for return of amounts withheld on contract settlements and paid to Roane-Anderson Company.[2]

A summary of the facts relative to this claim is as follows. After the project at Oak Ridge got underway, the question of housing workers for the Government's contractors became an acute one. Stone and Webster, acting on behalf of defendant, ran buses as far as 100 miles away to bring in workers. Some of the contractors operated their own transportation system by way of trucks and buses for the same purpose. The Government solved the problem insofar as its own workers and those of its cost-plus-a-fixed-fee contractors were concerned, by the construction of hutments for housing labor and the construction of restaurants to feed them. The Government's hutments were built by Government funds and operated under a cost-plus-a-fixed-fee type contract with Roane-Anderson Company. The hutments consisted of 16' x 16' plywood buildings to which a minimum of five and a maximum of eight men were assigned to each. Ten or 12 of such units were grouped around a central bathhouse which had toilets and lavatories and gang showers. In the summer and fall of 1943, complaints were received from the surrounding communities in regard to the sanitation conditions brought about by the labor housing situation off the townsite. Some of the contractors maintained their own camps and others undertook to transport their employees into the site from the surrounding communities. In the summer of 1943 an arrangement was made whereby employees of fixed-price contractors at Oak Ridge could be quartered in the Government's hutments at fees of 60 cents per night per employee, of which 20 cents would be paid by the employee and 40 cents by the employer. Every effort was made to advise all the contractors of this arrangement, and the various contractors did quarter their employees in the hutments under the arrangement.

Coupe Construction established its own labor camp at Norris, Tennessee, a distance of approximately 15 miles each way from the city of Oak Ridge. However, beginning in late January 1944, the camp became inadequate and some of its employees were sent to the Government's hutments for housing at Oak Ridge. Charges of 40 cents per night per employee were assessed against plaintiff for such employees and such charges were deducted from its monthly partial payments beginning with monthly pay estimate No. 5, dated April 22, 1944. The first deduction covered the period from March 11 to April 1, 1944. Deductions were also similarly made for hutment charges on plaintiff's pay estimates Nos. 6, 7, and 8. Itemized bills accordingly were submitted to plaintiff in each instance before the deductions. In each instance plaintiff accepted the deductions and made no protest against such payment until the fall of 1944 after the work was completed and several months after all the housing for its employees had ceased. During the month of June 1944 and thereafter, plaintiff made payments by check for the hutment charges without protest until after the work was completed and accepted. On occasion, plaintiff advised the Roane-Anderson Company in writing that it would no longer be responsible for the hutment charges for certain named individuals. It also advised Roane-Anderson Company of termination dates of the services of its employees for hutment purposes and named certain other of its employees who were occupying the hutments. It also advised the names of its employees whom it had authorized to use the hutment accommodations. A total of $7,662.40 was deducted from plaintiff's pay estimates to cover the hutment charges of its employees in the Government hutments at the rate of 40 cents per night per employee, and a total of $2,036.80 was paid by check by

2. The claim for return of charges paid by plaintiff for the housing of its employees by defendant was set out as one of the exceptions to the release.

plaintiff for such hutment charges on the same basis. The record does not show that any specific arrangements were made between plaintiff and Roane-Anderson Company, operating the hutments for the Government, for the housing of plaintiff's employees. However, the basis for the use of the hutments was well known to the contractors at Oak Ridge and to plaintiff.

As early as November 14, 1943, plaintiff had stated in writing that it would be able to house 80 men immediately, but asked the Government to supply housing for its colored labor. The housing arrangement for labor was one of the job conditions, and plaintiff was fully aware of the arrangements and the fact that it was expected to pay 40 cents per night for the housing of each of its employees. It participated in such arrangement by supplying identifications and tickets upon which the employees were admitted to the hutment facilities as its employees. It also cooperated with the hutment operators by giving notice of terminations and lists of employees who would be entitled to stay in the hutment facilities. Employees could gain admittance to the hutments only by request of their employer and by the presentation of the card issued by their employer.

Plaintiff now asserts that it was not obligated to pay for the housing of its employees and there existed no contract between it and defendant for such services. While the record does not show that plaintiff was ever formally advised or that plaintiff ever expressly agreed to pay such charges, certainly its employees did use the facilities furnished by the Government. In the bid form, space was provided for each bidder to specify the amount included for the purpose of housing, feeding, and transporting of labor for the project. The schedule of prices, set out in the contract, specified "the above contract price includes the cost of all housing, feeding, and transportation of labor for the project." Coupe Construction specified no allowance for housing, feeding, and transportation of labor in its bid, and its representatives

were called in and told that the labor situation should be investigated and that the housing, feeding, recruitment and transportation of labor would be the responsibility of the contractor. Under the conditions existing at the time, plaintiff could not have retained any labor without arrangements for housing. This was called to plaintiff's attention and a suggestion made that plaintiff make "on-the-spot" investigation. After plaintiff did make such investigation, it was permitted to raise the bid $30,000 and include that amount for the housing, feeding, and transportation of labor for the project. Thereafter arrangements were made to house plaintiff's employees in the Government hutments at Oak Ridge. Deductions were made from their monthly partial payments beginning with monthly pay estimate No. 5, dated April 22, 1944. At a later date, in response to billing by defendant's agents, plaintiff paid by check $2,036.80 for hutment charges. The deductions were accepted by plaintiff without protest until after the work was completed. Furthermore, a system was worked out whereby plaintiff would advise defendant's agents dates of termination of employment and listing the names of persons who were employees of Coupe Construction. Tickets were issued to plaintiff in blank form, which were in turn filled out and given to the men for presentation to the officer in charge of the hutments. An employee desiring to use the hutment facilities could gain admission only upon specific request by plaintiff and presentation of such ticket.

■ Therefore, we conclude that the hutment services rendered plaintiff's employees were at the request of plaintiff and, further, that plaintiff was aware of the fact that it would be expected to pay for such services. After this knowledge plaintiff continued to request the services and continued to pay for them. While there was no express agreement to pay, we conclude from the foregoing that a contract is implied, and plaintiff cannot escape liability for the hutment charges. See Niagara Falls Bridge Commission

v. United States, 76 F.Supp. 1018, 111 Ct.Cl. 338.

For the foregoing reasons, plaintiff's petition is dismissed.

Since the hutment claim is for moneys retained by defendant by reason of arrangements outside the construction contract, defendant filed a counterclaim therefor. However, the money in question is still in the hands of defendant, and inasmuch as we have determined that plaintiff has no right thereto, defendant's counterclaim is dismissed.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

**David WARE**

v.

**George E. GARVEY.**

**Civ. A. No. 55–863.**

United States District Court
D. Massachusetts.

Feb. 1, 1956.

