**Charles J. MOELLER, Regional Director, District No. I, et al. v. ATLAS POWDER COMPANY.**

Civ. No. 1956.

District Court, D. Connecticut.

Oct. 22, 1947.

**ASHEVILLE CONTRACTING CO. v. UNITED STATES.**

No. 45732.

Court of Claims.

April 5, 1948.

708

Fred W. Shields, of Washington, D. C. (King & King, of Washington, D. C., on the brief), for plaintiff.

Paris T. Houston, of Washington, D. C., and Peyton Ford, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

HOWELL, Judge.

This case involves a claim of the Asheville Contracting Company on behalf of the Grantsville Construction Company, a subcontractor, for certain excavation work and the building of certain retaining walls required under a contract dated April 25, 1936, with the defendant for the grading, draining and construction of two tunnels, a construction of approximately 3.442 miles of the Blue Ridge Parkway from Buck Creek Gap to Big Laurel Mountain, in Yancey and McDowell Counties, North Carolina.

There are five separate claims involved, and all of them arise out of and by reason of disputed measurements of quantities. These claims will be discussed separately.

First Cause of Action

The facts relating to this item of claim are fully set forth in Findings 15 through 24 and need not here be repeated. The head of the department determined that there were 2,223 cubic yards in the slide and that 2,013 were removed by plaintiff's subcontractor.

In his classification and in awarding values to the work performed, Thomas H. MacDonald, Commissioner of Public Roads, representing the head of the department, sustained the contracting officer by classifying the removal of 1,500 cubic yards of the 2,013 cubic yards, under item

2 of the contract at 49 cents per cubic yard. He also added 513 cubic yards under item 4, unclassified excavation for structures, at $1 per cubic yard.

There is no provision in the specifications under the heading "excavation for structures," providing payment for the removal of slide material. However, under the general provision, "contractor's responsibility for work," provision is made that the contractor shall rebuild, repair, restore, and make good all damages to any portion of the work except, among other things "slides found by the engineer to have been unavoidable." This slide was determined to have been unavoidable.

Under "Sections accepted for traffic," page 4, paragraph 2 of the specifications, it is provided that any parts of the highway which have been completed and "accepted for traffic" by the project engineer, shall not be the responsibility of the contractor to maintain, and that the work performed thereon would be compensated for in the manner provided in "extra and force-account work," "providing, however, that any slides that may occur on *such sections previous to completion and acceptance of the entire project* shall be removed by the contractor at the unit price per cubic yard for unclassified excavation." [Italics supplied.] It is our determination that the contracting officer in applying the rate provided under this section is in error.

The foregoing provisions relating to slides concerns only those portions of the highway which had been completed and accepted by the project engineer. Nothing contained therein is found applicable to slides occurring on uncompleted work, such as the slide described in Findings 15 to 25, inclusive.

The slide which occurred at station 444 refilled that portion of the trench in which no masonry construction had been performed. It also piled material higher than the original grade line, both over the trench area, and behind the portion of the wall which had been partially completed, and also a small portion overflowing the construction area was deposited below the trench.

Plaintiff's subcontractor not only excavated the material which landed in the trench where previous excavation had been performed, and which MacDonald found represented excavation for structure, but it also excavated material which had piled up to a greater height than the original grade line, as well as material which lodged upon the portion of the completed wall and back of it. It was necessary to reexcavate back of the completed portion of the retaining wall for the reason that this wall had not properly cured, and under the specifications backfilling was not permitted, except upon the direction of the project engineer. In the case of concrete or masonry work, of which the retaining wall was constructed, backfilling was preferably not to be ordered until the masonry had been in place 21 days.

Accordingly, plaintiff's subcontractor excavated the 2,013 cubic yards of material for the purpose of uncovering the completed portion of the wall and removing pressure from behind it as well as the reexcavation of the trench in order to complete the remainder of the retaining wall.

■ It is our determination that all of this excavation represented "unclassified excavation for structures" under item 4 of the contract.

Plaintiff was directed by the project engineer to replace behind the completed wall approximately one-half of the slide material excavated after the wall had cured.

■ MacDonald found, in accordance with item 25 of the contract, that only the material representing "excavation for structures" could be paid for as "special disposition of unclassified excavation for structures" (Finding 23). This item of the contract does not provide for the replacement of unclassified excavation under item 2.

Plaintiff having excavated 2,013 cubic yards of this slide material and having restored at least one-half of this amount for the embankment of the wall, would be entitled to the payment for this one-half

or 1,006 cubic yards as special disposition under item 25 of the contract, at 50 cents per cubic yard.

Result of Slide ... 2,223 Cubic Yards

Head of department determined that 2,013 cubic yards were excavated by plaintiff's subcontractor. This determination seems to be accepted by all parties, as it was also by the commissioner.

Final determination by the head of the department:

513 cubic yards reexcavated from the trench and allowed under item 4, at $1 per cubic yard ...................... $513.00

1,500 cubic yards excavated from behind the trench, between trench and mountain in order to save the uncured wall, under item 2, at 50 cents ................... 735.00

500 cubic yards which, as shown above, was rehandled and re-excavated from the trench, was, by direction of defendant's project engineer, *re-handled* and placed behind the wall—allowed under item 25 at 50 cents .............. 256.50

_____

1,504.50

2,013 cubic yards.

210 cubic yards fell down the side of the mountain and not rehandled.

_____

2,223 cubic yards total slide.

Commissioner's report gives the subcontractor—

2,013 cubic yards at $1 per cubic yard .............. $2,013.00

1,006 cubic yards at 50 cents .. 503.00

_____

2,516.00

Less amount already paid ....1,504.50

_____

Amount plaintiff is entitled to recover ...................1,011.50

### Second and Fourth Causes of Action

The second and fourth causes of action involve claims for an additional quantity of excavation for cement stone masonry walls and for an additional quantity of cement stone masonry wall construction. They are, therefore, considered together.

Under the supervision of H. C. Bingner, project engineer, measurements of the excavation for the walls and the wall construction were made and recorded as the work progressed. Progress payments were made to plaintiff for quantities of work performed on the basis of these measurements.

During July 1937, while the last wall was under construction, the project engineer's superiors became concerned about the correctness of his allowance to the subcontractor for work performed on the walls and sent John D. Cockey, an engineer from Washington, to the site to check the project engineer's calculations and the sea level elevations being used. This engineer checked the elevations and found that substantial differences existed between the true elevations and those being used by the project engineer. Substantial errors were found in the calculations which had been made from the measurements of wall excavation and wall construction and it was found that the project engineer had not recorded the correct lengths of the walls. As the completed walls had been back-filled, Cockey did not attempt to measure the heights or determine the sea level elevations of the walls at the bottom.

As a result of Cockey's investigation, the project engineer was removed and a successor, A. L. Cook, was assigned to that position for the completion of the work. Adjustments in accordance with Cockey's calculations were made on partial payment estimate No. 13.

After the work on the project was completed and while the quantities to be used in the final settlement were being considered, Haygard, the construction engineer, and his superiors decided that since doubts had been cast upon the records kept by Bingner, the original project engineer, remeasurement, to the extent possible, of the quantity of work performed should be made. By letter dated August 25, 1938, the principal contractor, the Asheville Contracting Company, requested that the project be remeasured as a whole. Accordingly, the whole project, including the walls in question, were remeasured by engineers assigned for the purpose by the Public Roads Administration.

In October 1938, Arthur K. Sonner, an engineer who had not previously worked on the project, was sent to the site with

a crew of six men, who were engaged for several weeks in measuring the walls and the excavation for the walls. It appears from the evidence that this engineering party did everything possible to make their measurements complete and accurate. They made measurements of the length, width of the coping at the top, and the height of the front batter of each wall. In measuring the height it was necessary to determine the locations of the base and footings. For this purpose, approximately one hundred holes were dug down the face of the walls, on an average of about every 25 feet of wall length and at the approximate wall stations where the original measurements were noted by Bingner. In the instances where it was not possible for this party to determine the bottom of the wall or the footing with certainty, the measurement shown by Bingner's notes were used in calculating the quantities for final payment. In some instances, Sonner and his party dug under the wall from three to five feet in order to make sure that the bottom had been reached. Since the roadway and embankment had been placed upon the upper side of the walls, no attempt was made to measure the back side or the width at the bottom. In this instance the measurements shown in Bingner's notes were used in calculating the final quantities. Thus the quantity of wall construction determined by defendant's engineers in the final payment was calculated from the notes of measurements made by Bingner except where varied by measurements made in 1938 by Sonner and his party and then only when they were satisfied that Bingner's measurements were wrong.

In determining the amount of wall excavation performed, it was necessary for Sonner to determine the elevation of the original ground. This was done by excavating through the waste soil until the original ground surface was located. In all instances where they were not satisfied that the level of original ground was discovered, Bingner's notes were used in the calculations. In the instances where it was found that the walls were not in the ground as deep as noted by Bingner, or the footings were not as large as represented, the depth and quantity of the excavation was reduced accordingly.

Much of the subgrade upon which the walls were constructed consisted of rock strata resting in leaning positions at various angles. The plans specified that the foundations for walls under such conditions would be stepped up from the front to the back. However, since it was not feasible for Sonner and his party to determine to what extent or in which places such construction existed, calculations for final payment were based upon measurement straight across from the front to the back.

The Commissioner found that "many of the footings were constructed in solid rock formations, generally in oblique positions, necessitating the cutting of steps or shelves upon which masonry was laid." To the extent that such construction was performed, plaintiff has been overpaid in the final payment for both wall excavations and wall construction.

The measurements taken by Sonner and his party showed that a great many of the measurements noted by Bingner, upon which progress payments had been made, were erroneous. Some allowed plaintiff too much excavation and wall construction and some did not allow plaintiff as much as was found to exist, and payments were made accordingly. When all the additional quantities where plaintiff had been underpaid and the deduction of quantities where plaintiff had been overpaid were considered, it was found that the result was overpayment by the partial payments of 431.77 cubic yards of wall construction and 573.80 cubic yards of wall excavation. Adjustments were made in final payment accordingly. These quantities were principally contained in the differences found in the size of the footings for the walls. Bingner's measurements showed some unusually large and massive footings. Explorations by Sonner proved that some of these footings did not exist and deductions were therefore made accordingly.

After final estimate was prepared but before final payment was made, it was shown to the prime contractor's president, W. H. Anderson, and his engineer, Cox. According to the evidence they stated they were satisfied with the estimate as

prepared, but the subcontractor who had performed the work was not satisfied and requested the prime contractor to reserve to it, the Grantsville Construction Company, a claim for $15,000 when final payment was made.

Among other items, the plaintiff listed in its claim to the contracting officer on July 11, 1939, a request for allowances of an additional quantity of work under item 12, class B cement stone masonry and an additional quantity of work under item 4, unclassified excavation for structures. H. J. Spelman, district engineer, acting contracting officer, denied the claim for this additional quantity on March 2, 1940. On March 30, 1940, Asheville Contracting Company, on behalf of the Grantsville Construction Company, appealed the decision of the contracting officer to the head of the department.

During February and March 1941, the head of the department caused defendant's engineers to resurvey and measure the wall excavation and wall construction and other disputed items of the work along the same line and in a similar manner to that performed by Sonner in the fall of 1938. For this survey and remeasurement, ten men for a period of about four weeks were engaged. Upon the basis of these measurements, the quantities were again calculated.

Under date of March 7, 1942, MacDonald, Commissioner of Public Roads, as the authorized representative of the head of the department, rendered a decision and sustained the decision of the contracting officer in regard to the quantities of wall excavation and wall construction determined except to reclassify 30.27 cubic yards of cement masonry wall from class B masonry at $12.50 per cubic yard to class A cement masonry at $16.00 per cubic yard.

■ It is obvious from a consideration of the above that every effort was made by the contracting officer and especially the head of the department to make their decisions fairly, impartially and as free from error as possible. Accordingly, we do not think that there is any substantial basis for holding that these officials acted otherwise and therefore their findings are sustained and the plaintiff's claim dismissed as to these causes of action. Rego Building Corporation v. United States, 99 Ct.Cl. 445; Maurice L. Bein v. United States, 101 Ct.Cl. 144.

### Third Cause of Action

The third cause of action involves a claim for additional quantities of "special disposition of unclassified excavation for structure" under item 25 of the contract. The plaintiff has abandoned this claim in its brief and therefore it requires no consideration.

### Fifth Cause of Action

This claim also involves a dispute with reference to the quantity of cement stone wall construction required to build a cement stone masonry jacket wall. Before the Grantsville Construction Company started work on the project, the Asheville Contracting Company constructed a hand-laid rock wall at approximate Station 589. In October 1936, this wall showed signs of failing and appeared to be in imminent danger of falling down the mountainside. Bingner, defendant's project engineer, requested the Grantsville Construction Company to build a cement stone masonry jacket wall immediately below and against the failing hand-laid rock wall as a brace to hold the hand-laid rock wall in place. This jacket wall was commenced about October 20 and completed early in November 1936. At the time of its construction, no measurements thereof were taken by the project engineer. After it was completed, Bingner, the project engineer, requested the Grantsville Construction Company to submit a bill for the cost of building the wall. An itemized bill was submitted by R. R. Cook, a member of the subcontractor partnership, in the total of $4,330.82. The project engineer divided this amount by $12.50 as the unit price for construction of cement stone masonry under item 12 of the contract and thereby determined that allowance and payment should be made for 346 cubic yards of the jacket wall. Payment was made in the November 1936 monthly estimates in the amount of $4,330.82 for construction of 346 cubic yards of class B cement stone

masonry at $12.50 per cubic yard under item 12 of the contract.

No further mention was made concerning payment for the construction of this jacket wall until on August 28, 1937, R. R. Cook, on behalf of the subcontractor, attempted to have a revision of the arrangements previously made with Bingner concerning payment for the wall and submitted to A. L. Cook, Bingner's successor as project engineer, another itemized bill totalling $5,059.96 which was similar to the previous bill except it included 15 per cent of labor and material as overhead expenses. Both bills submitted by Cook showed an itemization of the labor performed on the work. These were not in agreement with the payrolls submitted by plaintiff for the period in that the statements showed more men employed on the wall and generally for longer hours than was shown on the payrolls.

Defendant's engineers refused to consider adjusting payment for the jacket wall on the basis of the cost of this account. However, before making final payment and about October 1938, defendant's engineers made measurements of the length, height, and width of the top of the jacket wall and determined the thickness by measurement of the slant of the outside batter and compared this with the known slant of the outside of the hand-laid rock wall. These were found to be constructed on the same slant and since the jacket wall was built flush up against the hand-laid rock wall, it was determined that the jacket wall was of uniform thickness in each section from the top, where it could be readily measured, to the bottom. As a result of these measurements, it was found that the wall contained 359.76 cubic yards and the final estimate allowed plaintiff $4,497.00 for the construction thereof.

While the final estimate was being considered, R. R. Cook, representing the subcontractor, stated to A. C. Haygard, defendant's construction engineer, that he had made some measurements of the width of the jacket wall at the bottom during construction. Cook was asked to submit such measurements to defendant that they might be considered. Such measurements were not submitted and on October 28, 1938, before final payment was made, Haygard wrote to the subcontractor and requested submission of any measurements in its possession. However, such measurements were not submitted to the defendant until March 30, 1940, when appeal was taken to the head of the department from the decision of the contracting officer. These measurements did not show at what point they were taken and could not be utilized by defendant's engineers in calculating quantities for the wall.

In plaintiff's claim to the contracting officer on July 11, 1939, there was included 156.16 cubic yards of class B cement stone masonry under item 12 of the contract representing an additional quantity of construction the subcontractor contended was contained in the jacket wall in addition to the 359.76 cubic yards allowed in the final payment. The contracting officer disallowed this claim in his findings of March 2, 1940, and the claim was included in plaintiff's appeal to the head of the department on March 30, 1940. With this appeal, there was submitted for the first time certain measurements which the subcontractor alleged were measurements of the width of the jacket wall at the base.

Before MacDonald, as the authorized representative of the head of the department, made his decision, on March 7, 1942, defendant's engineers measured the jacket wall by measuring the length, height, slope of outside batter, the width of the coping at the top and determined the slope of the hand-laid rock wall above the top of the jacket wall. Based upon these measurements and calculations, the head of the department sustained the decision of the contracting officer and determined that the jacket wall contained 359.76 cubic yards.

In connection with this claim it is not possible to say that the construction engineer or MacDonald, the authorized representative of the head of the department, acted unreasonably or arbitrarily in determining the amount involved in arriving at the final settlement.

▆ In the first instance, when the wall had been completed, the original project engineer, Bingner, called upon R. R. Cook,

a member of the subcontractor partnership, to submit a bill for the cost of building the wall. This certainly was an invitation for the subcontractor to include all of his costs in this bill having before it the measurements which as later alleged were made at the time the wall was constructed. When it became apparent that the measurements of Bingner were grossly inaccurate regarding other quantities of materials involved, the head of the department replaced him with another engineer who immediately caused measurement to be made of the jacket wall. These measurements disclosed an additional amount of material involved and the final estimate allowed plaintiff for this increased amount. Later on, when R. R. Cook, still representing the subcontractor, again questioned the amounts involved upon appeal taken to the head of the department, the head of the department caused a remeasurement to be made and as a result thereof sustained the contracting officer's finding. It is significant that on this final appeal plaintiff's subcontractor submitted for the first time certain figures which were supposed to have been made at the time the wall was laid. It appears to us that if the plaintiff actually had these figures in its possession, it was under an obligation to disclose them at the time it submitted its original bill in response to the request of the project engineer. Having failed to do so, and waiting as plaintiff did until after one measurement had been made and a remeasurement was about to be made, the head of the department did not act arbitrarily in disregarding these figures and relying upon the second measurement made by his representatives.

■ In connection with this claim, therefore, we cannot say that the contracting officer or the head of the department acted unfairly, but on the contrary find that there is substantial evidence to support his final ruling. For these reasons this claim must also be dismissed. Rego Building Corporation, supra; Maurice L. Bein, supra.

■ We are further of the opinion that the Asheville Contracting Company is the real plaintiff in this suit, the case having been prosecuted in its name to the use of Grantsville Construction Company. Blair v. United States, 101 Ct.Cl. 861; Id., 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039. The evidence in this case establishes beyond any question that the suit is brought in the name of the prime contractor and that it gave the subcontractor permission to use its name for the purpose of bringing the suit. The prime contractor in executing the voucher upon which final payment was made reserved the right to file this claim on behalf of the subcontractor. Furthermore, the prime contractor on behalf of this subcontractor, on March 30, 1940, filed notice of appeal from the findings of the district engineer to the head of the department. These acts by the prime contractor seeking to preserve this claim on behalf of the subcontractor refute the defendant's argument that the prime contractor is a mere nominal party who may later disavow the results of this case. Furthermore, the acceptance of payment by the prime contractor of his relatively small interest as plaintiff in this case would preclude a later disavowal of this action. The recovery in this case is therefore based on the unit prices provided in the contract between the Asheville Contracting Company and the defendant. Distribution of the judgment between the Asheville Contracting Company and the Grantsville Construction Company depends upon the provisions of their contracts.

Judgment will be entered in favor of the plaintiff in the amount of $1,011.50. It is so ordered.

JONES, Chief Justice, and MADDEN, WHITAKER and LITTLETON, Judges, concur.