Booth, Chief Justice,
delivered the opinion of the court:
This case was before this court in 1926. Plaintiff’s petition was dismissed (61 C. Cls. 777). The Supreme Court on December 12, 1927 (275 U. S. 509, 510), reversed our judgment and remanded the case under the following order:
“ This court is of opinion that the Secretary of the Navy had authority to make further contracts to pay the petitioner the increased cost resulting’ from the wage increases put into effect at the Secretary’s instance, in the course of the petitioner’s performance of the original contracts, and that the findings of the Court of Claims show that such further contracts were made and were based upon an adequate consideration, consisting of both advantage to the Government and detriment to the petitioner. The findings on other points are not such as to enable this court finally to dispose of the case. Accordingly the judgment of the Court of Claims is reversed and the cause is remanded to that court with directions (1) to make further findings (a) as to whether the instruments of release express the actual intention of the parties in respect of a settlement or release of the petitioner’s claim for increased cost resulting from putting into effect the increased wages, or whether through mutual mistake, duress, or other sufficient ground for reformation the instruments of release were so drawn and signed that they failed to express the actual intention of the parties in that respect, and (b) as to what amount of increased cost to the petitioner resulted from the wage increases as respects work done under the original contracts after the wage increases took effect; (2) to make these findings from the evidence already taken and any additional evidence which the Court of Claims may deem it proper to receive; (8) to allow any amendments of the pleadings which may be needed to present the question whether the instruments of release should be reformed to express the actual intention of the parties in the particular herein named; and (4) to render such judgment in the cause as may be appropriate in view of the amended pleadings and the supplemented findings.
“The mandate herein shall issue forthwith.”
Subparagraph (a) of the foregoing order of remand is the one now in issue.
The plaintiff, a West Virginia corporation, during the years 1915, 1917, and 1918 entered into eight written contracts to manufacture and deliver to the Government a specified number of torpedoes. The contracts were per *194 formed by the plaintiff to the satisfaction of the Government, and this litigation involves seven releases executed by the plaintiff at the time final payments were made by the Government of the consideration expressed in the contracts. The contracts exacted the execution of final releases of all claims arising under the contracts before final payment would be made. While the plaintiff was engaged in performing the contracts an acute situation with reference to the wages and working conditions of mechanics and laborers engaged in Governnment work arose, due to war conditions. The War and Navy Departments adopted a policy designed to stabilize wages and remove all causes for discontent and deal justly with laborers and mechanics, either in the employment of Government contractors or directly with the departments. Not only the urgent necessities of the times but the inclination of the officials themselves required a course of action to meet the abnormal economic conditions then prevailing. The adopted policy, hereafter discussed somewhat in detail, embraced a programme of uniformity and provided a stabilized wage scale applicable in its provisions to both skilled and unskilled labor. Wages were increased, and through investigations made by appointed boards were put into effect to the extent of reaching Government contractors generally. The plaintiff, notwithstanding its protest against the adoption of the advanced wage scales, was required to put them into effect, did so, paid the higher wages, has received an admitted award from a duly constituted board of the department of $715,-200, and it is riot disputed that under the decisions of the Supreme Court in this case a contract to pay the same arose, is valid, and that the amount awarded is correct.
The sole defense to the suit is predicated upon the conclusive and binding effect of seven of the eight releases executed by the plaintiff when it received the final payments of the stipulated contract price. One clause in each of the contracts involved provides as follows:
“ * * * that from the last payment or payments becoming due thereunder there shall be reserved the sum of not less than five thousand dollars ($5,000.00), to be paid after the acceptance of the last lot of material and upon *195 the execution by the party of the first part of a release to the United .States, in such tenor and form as shall be approved by the Secretary of the Navy of claims against the party of the second part arising under or by virtue of said contract * *
.The seven releases relied upon, executed upon different dates, were in part as follows:
“ Now, therefore, in consideration of the premises and of the sum of six thousand five hundred three and 51/100 dollars ($6,503.51) lawful money of the United States, the amount of the final payment due under said contract, being to it in hand paid by the United States, represented by the Chief of the Bureau of Ordnance, the receipt whereof is hereby acknowledged, the E. W. Bliss Company does hereby, for itself, its successors and assigns and legal representatives, remise, release, and forever discharge the United States of and from all manner of debts, dues, sum and sums of money, accounts, reckonings, claims, and demands whatsoever, in law and in equity, for or by reason of or on account of the manufacture and delivery of torpedoes, appurtenances, and spare parts under the contract aforesaid, and does hereby further guarantee to fulfill and comply in all respects with the requirements of paragraph numbered seventy-nine (79) of the specifications annexed to and forming part of said contract.”
The eighth release, given under contract #1228, contained, in addition to the above provisions, the following proviso:
“ Provided, That this release shall not be taken to include claims arising under the said contract other than those which the Secretary of the Navy has jurisdiction to entertain.”
The plaintiff seeks a reformation of the seven releases, predicating its contention upon a mutual understanding and intent of the parties that at the time of their execution the parties did not contemplate or intend them to embrace a settlement of the plaintiff’s claim for extra wages paid its laborers under the department’s orders and contract; that through mutual mistake, as now worded, they do not express their designed and intended purpose, which was to limit the releases to simply a conclusive settlement of all sums, claims, etc., due or which might arise under the express terms of the contracts. It is evident from this as well as other cases of a similar character that the Navy *196 Department in formulating and adopting its policy of increased wages to laborers, whereby an additional expense was imposed upon contractors, had neither the authority, power, nor inclination to do so without reimbursement to contractors where reimbursement was due. (Electric Boat Co. v. United States, 66 C. Cls. 333.) To first establish a policy, then a uniform wage scale, and finally to put the scale into effect involved a series of investigations, conferences, and deliberations of extreme importance and care. It was a distinct subject-matter of very great public and private importance. As the record herein indisputably attests, the department succeeded with promptness and satisfaction in establishing its general policy and its precise scale of wages to be paid, but encountered obstacles in the way of paying reimbursement to contractors with whom it had an agreement to reimburse, which were not finally removed until the decision of the Supreme Court in this very case.
The first agency established to effect the stabilization of wages of laborers generally was the shipbuilding labor adjustment board created August 20, 1917. On April 8, 1918, the President by proclamation created the National War Labor Board. On June 18, 1918, the War and Navy Departments entered into an agreement with certain employers and employees then engaged in supplying war material and supplies to the Government, by the terms of which harmonious wage1 scales were to be brought about and awards made to effect the same. The plaintiff, while not a party to the above agreement, received notice of the above memorandum award. The plaintiff at this time was experiencing no labor troubles on account of wages, no strike was imminent, and none anticipated. Shortly thereafter, however, on August 23,1918, the plaintiff was advised that it was to put into effect the wage scale approved by the department and present its claim for iñcreased cost of performance. The plaintiff protested against the application of the foregoing order to its plant, pointed out to the department in various written communications and conferences the lack of necessity for adopting the increased wage scale, and finally asserted that, if compelled to adopt it, would assuredly expect reimbursement for the increased *197 cost of production incurred. The plaintiff was expressly-assured by the department that reimbursement would be made, dependent as to amount upon investigation to be made by a board to be appointed by the Secretary of the Navy. On August 27, 1918, the plaintiff received from the Secretary of the Navy a written request to put into effect in its plant the increased wage scale adopted in accord with the terms of the memorandum award of June 18, 1918, to become effective on September 2, 1918, and the above notice was supplemented by another on September 10, 1918, from the Chief of the Bureau of Ordnance, not only specifying in detail the plaintiff’s contracts with the department, and urging the plaintiff to put into effect the advance wage scale of the board, but enclosing a separate written agreement for the plaintiff’s acceptance, providing for the adoption of the department’s agreed-upon wage scale, in which a stipulation was inserted that the “ Navy Department agrees that if it is legally possible such further adjustments will be made as of date of September 2,1918.” The plaintiff accepted the terms of the order and agreement of September 10, 1918, and thereafter complied therewith, advancing the wages of its employees in accord with its terms, effective as of September 2, 1918. The department observed its agreement to investigate plaintiff’s plant and report upon what, if any, extra cost should be awarded it because of the advance in wages. A personal representative of the department visited its plant, interviewed its workmen and mechanics, and in virtue of interviews and questionnaires classified its employees to correspond to the board’s classification for wage increases. The plaintiff was not allowed to and did not participate in this proceeding.
On October 81, 1918, the plaintiff applied to the department for increased compensation and inquired the method of presenting its claim. On December 14, 1918, the Secretary of the Navy appointed a board of three naval officers to consider and pass upon the plaintiff’s claim for increased costs of performance, and this board on July 14,1919 (Finding XII), recommended that the contractual price of each torpedo to be manufactured under existing contracts be *198 increased to $150, resulting in an award to plaintiff of $715,200. The report of the board was approved by Ralph Earle, Rear Admiral, U. S. N., Chief of the Bureau of Ordnance, and forwarded to the Secretary of the Navy July 22, 1919. The plaintiff made repeated attempts to procure the payment of the award, but without success. The Comptroller General rendered an opinion that under the law the consideration for the performance of the contracts, expressed therein, could not be increased by supplementary contracts to pay the same; that contracts of this nature were without consideration and void, and payment of reimbursement was thereafter withheld by the department pending the settlement of this issue. Thus the controversy continued until the institution of this suit.
From the record it seems certain that both the contractors and the officials of the department in direct contact and charge of plaintiff’s claims and relationships with the same treated the question of the payment to the plaintiff of the amount of thé board’s award in precisely the same way and manner as any other solitary and single claim would have been treated.
The course of proceedings narrated above in detail clearly demonstrates that what was pending was the right to pay an allowed award, one arising in due course of administration, and attributable to the war conditions. Settlement of this claim was in fieri; the facts had been found, the award made, but payment was suspended awaiting decision of the courts. Under these circumstances there existed no reason for exacting a release or receipt from the plaintiff with respect to the claim. The department could not pay it, and the plaintiff’s only remedy was to resort to the courts. No room for a compromise prevailed, and in so far as the department was concerned, its resources had been exhausted and proceedings ended. The releases relied upon as including settlement of this claim were executed on various dates between June 6, 1919, and July 19, 1922, an extended period of over three years.
The eight torpedo contracts involved a total expenditure • of thirty-five million dollars. Each contract by its express *199 stipulations created mutual rights and obligations giving rise to claims both for and against the contracting parties, in some instances increasing the consideration for performance and in others diminishing it. The Government retained percentages from partial payments; possessed the right to impose liquidated damages for delay and might, for stipulated causes, cancel the contracts and impose liability upon the contractor for alleged nonperformance. Penalties were to be imposed upon the contractor for failure to observe certain obligations; the Government was to be held immune from infringement of patents, and without going further into detail it is sufficient to observe that thirteen paragraphs of the contract provisions are clearly susceptible to controversy, giving rise to claims and subject to many settlements before final installment of the provided consideration was to be paid. In contracts of such magnitude and importance the Government very wisely exacted final releases in order to irrevocably conclude proceedings thereunder. This, we think, was the precise limitation of the legal effect of the releases. The words all “ claims and demands whatsoever, in law and in equity, for or by reason of or on account of said contract and supplemental agreement thereto dated December 13, 1920,” indicate the settled purpose and intent of the parties in executing them. The contracts and payments due under their terms were the independent transactions under consideration. The subject matter of additional compensation for advanced wage scales was not before the parties at the time, and formed no part of the negotiations leading to a final discharge of the Government under the written contracts to manufacture torpedoes. The Government could not have paid the wage-scale award at the time of the execution of the releases if so disposed, for the Comptroller General’s opinion prevented it, and assuredly there can be no- presumption that the plaintiff in securing payments legally due in accord with the express terms of its contracts was also intending to release an obligation to reimburse it for an admitted outlay, in addition to its contractual consideration, of over seven hundred thousand dollars. The express terms and provisions of the releases exclude this claim from their scope and *200 effect. The subject matter of this suit is not the direct result of or arising under or from the contracts mentioned. The contracts were in existence when the crisis arose. The Government might have lawfully exacted performance of them according to their terms. Charles Nelson Co. v. United States, 56 C. Cls. 448; Willard, Sutherland & Co. v. United States, 56 C. Cls. 413. The plaintiff was willing to go forward, exacted no increases, and so asserted, but the Government, in pursuance of a national policy, adopted a universal method of procedure to stabilize wages and do justice to laborers because of war conditions. To discriminate between contractors and allow one rate of wages to. prevail in one plant and another rate in a different plant performing similar work would, of course, have thwarted the-very purpose to secure uniformity and peaceable labor conditions. This condition and the accompanying remedy proposed were not the result of contracts; it is attributable to the war, and, of course, required an independent course of action predicated upon an independent investigation and course of procedure. The adopted policy applied to all transactions involving the employment of labor, whether under contract or otherwise. The Government’s necessities gave rise to the transaction, and made it applicable to existing contracts as well as all other war conditions. With this situation confronting the parties the proof is decidedly overwhelming that the parties to the releases relied upon did not intend to foreclose the plaintiff from asserting its. claim to the wage board award. The officers of the department in direct charge of the contract settlements on their Merits without exception so testify, and the record corroborates their testimony. One release, #1223, contained a reservation of the right to sue. It was prepared by the Navy Department, the reservation inserted by the department upon the suggestion and advice of the Judge Advocate General’s office and not intended to be limited to this one release. At the time the plaintiff signed release #1223 the other releases had been executed, and the fact that neither party intended the releases to cover this subject matter is demonstrated by the fact that a release was exe- *201 rated by the same parties two days later and the reservation omitted. No witness in the record has ever contended that the plaintiff’s attention was directed to the necessity of such a reservation, except in #1223, or that the subject matter of this suit was discussed at the time of the execution of the releases.
The defendant makes no serious defense as to liability under release #1223, and the reason for excepting release #1223 and awarding judgment under a pro rata basis is not apparent when the wage scale applied generally to the performance of all the contracts involved and the amount of the award is conceded to be correct. In the case of Fire Insurance Association v. Wickham, 141 U. S. 564, 580, 581, the Supreme Court said:
“Aside from this, however, the circumstances attending the execution of a receipt in full of all demands may be given in evidence to show that by mistake it was made to express more than intended, and that the creditor had in fact claims that were not included. Thus in Simons v. Johnson, 3 B. & Ad. 175, which was an action of covenant, defendant pleaded a release, which recited that various' disputes were existing, between the parties, and that actions had been brought against each other which were still pending, but that it had been agreed between them that, in order to put an end thereto, the defendant should pay the plaintiff £150, and that each should release the other from all actions, causes of action and claims brought by him, or which he had against the other, and the instrument then proceeded to release £ all claims, demands, actions whatsoever.’ It was held that parol evidence was admissible to show that the claim upon the covenant was not intended to be included in the release, Littledale, J., saying: ‘ There can be no doubt that the matter contemplated in this release was the actions there referred to, and parol evidence was admissible to show that the subject matter of the present action was not involved in them.’ ”
Gem Hammock Co. v. United States, 60 C. Cls. 262. In the case of United States Cartridge Co. v. United States, 62 C. Cls. 214, 230, 231, this court held, in a situation similar to the present case, as follows:
“ There is only one other question presented with reference to this item and that is predicated on the fact that *202 upon two items of an entirely different nature the plaintiff had filed a claim with the Boston District Claims Board which had finally been allowed in the sum of $6,571.44, of which allowance the plaintiff was informed, and upon payment of which it was required to sign a release. These two items were the only items involved in that claim, but in the preparation of a release to be signed a form was used which contained a general release of all claims under the contract. At this time the claim for additional labor costs already referred to was pending before another board and was being vigorously prosecuted, and there was no conception apparently upon the part ox anyone having to do with these transactions that the two claims had any relation to each other or that the execution of the release in connection with the claim allowed for $6,577.44 in any manner affected the rights of the plaintiff as to its claim for increased labor cost. It is so apparent that this release then signed was not intended to have any effect upon the pending claim for increased labor costs that there could be no justification for giving it any such application at this time.”
This court may reform a contract. Ackerlind v. United States, 240 U. S. 531. The case of United States v. William Cramp & Sons, 206 U. S. 118, is not, we think, applicable. In the Gramf case the suit was to recover for delays attributable to the Government in the way of failure of the Government to deliver to the plaintiff armor plate in the order and .at the times needed to complete the work, an obligation the Government assumed in the contract and did not perform. When the time for settlement arrived a complete and conclusive release executed in conformity with the provisions of the contract obviously precluded the plaintiff from recovering for a breach of the contract. What we have said as to independency of the two transactions involved herein expresses our view. In the Cramp case (supra) the settlement involved the contract and it alone.
Judgment for plaintiff for $715,200. It is so ordered.
Williams, Judge; LittletoN, Judge; and GiíeeN, Judge, concur.