**H.L.C. & ASSOCIATES CONSTRUCTION COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 317–64.

United States Court of Claims.

June 10, 1966.

John L. Kilcullen, Washington, D. C., attorney of record, for plaintiff.

Isaac D. Benkin, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

PER CURIAM.*

On January 17, 1961, plaintiff, a North Carolina corporation, entered into a contract with the Department of the Navy to construct a Capehart Act housing project of 450 units at Quantico, Virginia. Pursuant to instructions from the Navy via the Federal Housing Administration (FHA), plaintiff caused the site to be divided into three mortgage areas, each of which was given a separate FHA project number and which became known as mortgage areas A, B, and C. Each of the projects was to be financed by a separate loan, and the contract contained a specific clause for the "severability of contract as to each project." [1]

Tenants were expected to furnish their own air-conditioning appliances. Some of these appliances operate on 110 volts; others operate on 220 volts. The contract specifications, anticipating the need for flexibility, called for 3-wire conductors to the air-conditioning outlets.

Throughout mortgage area C, the first segment to be completed, the electrical subcontractor installed 2-wire conductors and was proceeding with the same wiring in areas A and B when, on May 18, 1962, a tenant in area C connected a 110-volt appliance to a 220-volt receptacle and blew a fuse. The contracting officer thereupon required plaintiff to replace all 2-wire conductors in mortgage areas A and B with 3-wire conductors. The subcontractor complied with the order at some extra expense for tearing out and replacing finished surfaces and wire.

Plaintiff presented a claim to the contracting officer for an equitable adjustment for a change under the changes article of the contract and, when this was denied, pursued its administrative remedy before the Armed Services Board of Contract Appeals (ASBCA) under the disputes clause.

Meanwhile, plaintiff had executed a release and received final payment for mortgage area C, and while his administrative appeal was pending, likewise executed separate releases as to mortgage areas B and A, in that order.

When the appeal came before the AS-BCA, the contracting agency pleaded the releases in bar of plaintiff's claim; the ASBCA upheld the plea as to both mortgage areas; and noted its further conclusion that the claim was without merit.

Plaintiff thereupon filed the present action as a claim "on behalf of and for the benefit of its subcontractors" for an alleged breach of contract resulting from

---

* This opinion incorporates, with deletions and minor changes, the opinion prepared, at the direction of the court under Rule 54(b), by Trial Commissioner W. Ney Evans.

1. Article XXIII. Following is the text of the provision: " * * * This Housing

Contract shall be deemed to be severable as to each of the three housing projects covered hereby and the obligations of each of the parties hereto shall be several and not joint in respect of each of the said housing projects to the same extent and like effect as if separate and several contracts had been entered into * * *."

the refusal of the contracting officer to grant an equitable adjustment under the changes article as for a change inherent in the replacement of 2-wire conductors with 3-wire conductors, pleading that—

* * * in * * * refusing to recognize petitioner's interpretation of the contract as reasonable, and in holding that the claim was barred by releases, the Board's decision was not supported by substantial evidence and was arbitrary, capricious, and so grossly erroneous as to necessarily imply bad faith.

In its answer to plaintiff's petition, defendant denied substantially all of the material allegations and asserted four complete affirmative defenses and a fifth, partial affirmative defense, as follows:

(1) That the decision of the ASBCA is final, conclusive, and binding.

(2) That the claims asserted in the petition are barred by releases.

(3) That there was no privity of contract between the subcontractor and defendant, wherefore the court lacks jurisdiction to adjudicate the claim.

(4) That plaintiff is not the real party in interest.

(5) That if plaintiff be deemed entitled to recover, the amount may not exceed $17,600, because of the statutory ceiling imposed by the Capehart Act.

Three months after filing its answer, defendant moved for summary judgment, asserting that "there is no genuine issue of material fact." Plaintiff duly responded with its opposition to defendant's motion and its cross motion for summary judgment, likewise asserting that "there is no genuine issue of material fact." Defendant has replied to plaintiff's opposition and cross motion.

With its initial motion for summary judgment, defendant filed the documentary record of the appeal before the ASBCA, which the plaintiff "adopts" in its opposition and cross motion.[2]

The issues in the case are (1) whether the releases executed by plaintiff operate as a bar to its claim with respect to mortgage area B or mortgage area A or both; and (2) if the claim is not so barred as to either or both, whether the wiring claim is meritorious as to the area or areas not released.

### I

The contract contained the following provision:[3]

Upon completion and acceptance of all work required hereunder, the amounts due the eligible builder under this Housing Contract from mortgage proceeds will be paid by the respective mortgagor-builders. Final amounts shall be payable after the eligible builder shall have furnished such mortgagor-builders and the Department with a release, if required, of all claims against the Department and/or such mortgagor-builders arising under and by virtue of this Housing Contract, other than such claims, if any, as may be specifically excepted by the eligible builder from the operation of the release in amounts stated therein.
* * *

On March 1, 1962, plaintiff executed the following release concerning area C:

The work * * * having been satisfactorily completed and accepted * * * the undersigned hereby remise, release and forever discharge the United States * * * of and from any and all claims and demands whatsoever arising out of or by virtue of said contract except as follows: See Exhibit "A".

Exhibit "A" summarized the terms of an escrow agreement for delayed completion of specified items not here material.

2. By stipulation of the parties there has also been submitted and received a physical "exhibit consisting of a mock-up of the electrical circuits involved in this controversy," which is in replacement of a similar exhibit that was before the ASBCA but which was withdrawn and subsequently lost by plaintiff.

3. Paragraph 14(d) of the General Provisions.

Since defendant did not require the contractor to make corrections of the wiring in area C, that area is not in controversy in this action.

On July 9, 1962, the contracting officer denied plaintiff's claim for an equitable adjustment on account of the wiring replacements in mortgage areas A and B.

On July 30, 1962, plaintiff executed a release as to mortgage area B which was in all respects identical to its release of mortgage area C, except for minor variations in the reservation of escrow claims for delayed completion.

On August 1, 1962, plaintiff appealed the contracting officer's decision of July 9 to the ASBCA.

On August 30, 1962, plaintiff executed a release concerning mortgage area A which was identical to the other releases except as to the reservations in Exhibit "A".

Exhibit "A" attached to the foregoing release contained the following reservation:[4]

The Eligible Builder reserves the right to assert claims against the United States * * * in the amount of $500,000.00 for damages suffered by the Eligible Builder * * * due to, but not limited to, damages caused by the Department of the Navy by the daily, constant, continuous, arbitrary and unreasonable interference with and disruption of the work of the Eligible Builder under said contract, the arbitrary rejection of work and materials of the Eligible Builder although said work and materials complied with the standards of workmanship and quality of materials required under the plans and specifications and said Housing Contract, all of which caused undue and unnecessary increased costs to the Eligible Builder and other damages in the performance of the contract by the Eligible Builder.

As heretofore noted, when plaintiff's appeal to the ASBCA came on to be heard, the contracting agency pleaded the releases in bar of the claim as to both mortgage areas, B and A, and the AS-BCA upheld the plea.

With respect to the release of area B, the ASBCA noted that the contractor's appeal had been filed on August 1, 1962, 2 days after the execution of the release of July 30, and concluded as follows: ·

There is no evidence contemporaneous with the execution of the release of 30 July 1962 as to any intention to limit the generality of the release of 30 July 1962 beyond what is stated therein. At the hearing the parties stipulated that appellant's vice president, who executed the release dated 30 July 1962, if called as a witness, would have testified that he had not intended to release the instant claim, and that the failure to set it out as an exception had been due to an inadvertence on his part and the rush of closing time. The parties also stipulated that appellant's vice president and other representatives of appellant participating in this closing, including counsel specially employed for Capehart closing transactions, had had prior experience with the closing of mortgages on Capehart projects.

On the evidence we are of the opinion that the subjective and unmanifested intention of appellant's vice president did not avoid the otherwise general effect of the release executed 30 July 1962, that it was not obvious that the failure to include the instant claim as an exception was attributable to mistake or oversight, and that the instant claim was released as to mortgage area B. See J. G. Watts Construction Company v. United States[5] * * *.

With respect to plaintiff's release of mortgage area A, executed August 30, 1962, the ASBCA found and concluded as follows:

* * * appellant reserved the right . to assert claims against the Govern-

4. Two other reservations, relating to escrow agreements for delayed completion, are not material.

5. 161 Ct.Cl. 801 (1963).

ment in the amount of $500,000 for damages suffered by appellant in the performance of the subject contract "due to, but not limited to, damages caused by the * * * Navy by the daily, constant, continuous, arbitrary and unreasonable interference with and disruption of the work * * *, the arbitrary rejection of work and materials * * * although said work and materials complied with the standards of workmanship and quality of materials required under the plans and specifications * * *." Respondent in these proceedings has pleaded the general release executed 30 August 1962 as a bar to the claim to the extent of mortgage area A.

There is no evidence contemporaneous with the execution of the release of 30 August 1962 as to what was intended by the described further exception. The parties stipulated at the hearing that appellant's vice president, who executed the release dated 30 August 1962 (Being the same individual who executed the release dated 30 July 1962 on mortgage area B), if called as a witness, would have testified that he had intended the described further exception to include the instant claim.

In our opinion, the language of the further exception did not include the instant claim. The dispute was not about interference, or disruption, or compliance of the work with standards of workmanship and material quality, but concerned only the substantive question of whether one type or the other of conductor was called for by the contract. To extend the exception to the instant claim by resort to the words "not limited to" that accompanied the enumeration of excepted matters would run counter to the normal method of construing exceptions, since it would expand the exception to include any unenumerated claims appellant might choose to assert and thus entirely defeat the release. Nor can the exception be given the scope contended for on the basis of the subjective and unmanifested intention of appellant's vice president. In our opinion, therefore, the instant claim was also released as to mortgage area A.

In support of the validity of the release of July 30, 1962, as a bar to the wiring claim with respect to mortgage area B, defendant relies on the Supreme Court's decision in United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907), holding that a general release precludes a party to the contractual armistice from renewing or initiating further combat, and a series of cases in this court applying the same principle, i. e., that a contractor who executes a general release cannot thereafter successfully maintain a suit, either for damages or for amounts allegedly due under the contract, based upon events which occurred prior to the execution of the release.[6] More specifically, the proposition is advanced that a claim not specifically delineated, both as to substance and amount, in an exception to the release is thereafter forever barred and cannot be reinstituted in the Court of Claims.[7]

Plaintiff admits, of course, that the release of July 30, 1962 (mortgage area B), contained no exception of the wiring claim, but contends that the fail-

6. The cases cited by defendant include: Cannon Construction Co. v. United States, 319 F.2d 173, 162 Ct.Cl. 94 (1963); J. G. Watts Construction Co. v. United States, 161 Ct.Cl. 801 (1963); Rachelle Enterprises, Inc. v. United States, 169 F.Supp. 266, 144 Ct.Cl. 701 (1959); A. L. Coupe Construction Co., Inc. et al. v. United States, 139 F.Supp. 61, 134 Ct.Cl. 392, cert. denied 352 U.S. 834, 77 S.Ct. 52, 1 L.Ed.2d 53 (1956); Torres, Jr. v. United States, 112 F.Supp. 363, 126 Ct. Cl. 76, (1953); Jacobson Bros. Co. v. United States, 98 Ct.Cl. 1 (1942); and H. B. Nelson Construction Co. v. United States, 91 Ct.Cl. 476 (1940), cert. denied 312 U.S. 696, 61 S.Ct. 731, 85 L.Ed. 1131 (1941).

7. Citing: Bein v. United States, 101 Ct. Cl. 144 (1943); Eastern Contracting Co. v. United States, 97 Ct.Cl. 341 (1942); and Shepherd v. United States, 113 F. Supp. 648, 125 Ct.Cl. 724 (1953).

ure to except it was an inadvertent and unintended omission. Plaintiff relies upon the fact that the surrounding circumstances tend to show that the contractor did not intend a general release. Before the ASBCA, counsel stipulated that plaintiff's vice president who signed the release would have so testified, if called. Moreover, plaintiff's appeal from the contracting officer's decision was filed 2 days after the signing of the release. It may be inferred that the appeal was in preparation on and before July 30. Plaintiff would translate this situation into a mutual mistake, warranting reformation, on the strength of this court's decision in Nippon Hodo Co., Ltd. v. United States, 160 F.Supp. 501, 142 Ct.Cl. 1 (1958).

The language of the release involved in J. G. Watts Construction Co. v. United States, supra, was, in all material respects, identical to the wording of the releases executed by plaintiff in the instant case. The opinion in *Watts* said:[8]

* * * Under identical contract provisions and releases executed pursuant thereto, contractors have, in similar situations, consistently been precluded from subsequently asserting claims arising out of their contract performance which were not excepted from the provisions of the release. A. L. Coupe Construction Co., Inc. v. United States [139 F.Supp. 61], 134 Ct.Cl. 392, 398–399 (1956); Jacobson Brothers Company v. United States, 98 Ct.Cl. 1, 26–27 (1942); H. B. Nelson Construction Co. v. United States, 91 Ct.Cl. 476, 486–487 (1940).

The *Watts* opinion further summarized the cases wherein the prosecution of claims has been permitted despite the execution of a general release:[9]

There are, of course, special and limited situations in which a claim may be prosecuted despite the execution of a general release. For instance, where it is shown that, by reason of a mutual mistake, neither party intended that the release cover a certain claim,

the court will reform the release. Nippon Hodo Company, Ltd. v. United States [160 F.Supp. 501], 142 Ct.Cl. 1 (1958); E. W. Bliss Co. v. United States, 70 Ct.Cl. 176 (1930); L. W. Packard & Co. v. United States, 66 Ct.Cl. 184, 192–193 (1928). * * * Similarly, where the conduct of the parties in continuing to consider a claim after the execution of the release makes plain that they never construed the release as constituting an abandonment of the claim, Winn-Senter Construction Co. v. United States, [75 F. Supp. 255], 110 Ct.Cl. 34, 65–66 (1948), or where it is obvious that the inclusion of a claim in a release was attributable to a mistake or oversight, Colonial Navigation Co. v. United States, [181 F.Supp. 237], 149 Ct.Cl. 242 (1960), or where fraud or duress is involved, Winn-Senter Construction Co. v. United States, supra, [110 Ct.Cl.] at p. 66; Michael Rose Productions v. Loew's Inc., 143 F.Supp. 606, 607 (D.C.S.D.N.Y., 1956), the release will not be held to bar the prosecution of the claim. See, also, Rocky River Co., Inc. v. United States, 169 Ct.Cl. 203, 207–08 (1965); Harvey-Whipple, Inc. v. United States, 169 Ct.Cl. 689, 696–99, 342 F.2d 48, 52–4 (1965).

In the instant case the facts pertaining to the release of July 30, 1962 (mortgage area B) do not support the contention that there was a mutual mistake of inadvertence or omission. If one accepts, as the ASBCA did, the stipulation that plaintiff's vice president would have testified that he had not intended to release the wiring claim, the inadvertence remains a unilateral mistake of omission. The situation with respect to mortgage area B is therefore identical to the situation upon which the decision in *Watts* turned:

* * * there is nothing in the * * facts which serve * * * to place this case in any of these * * * [excepted] categories. All we have is the simple case of a contractor who

---

8. P. 805 of 161 Ct.Cl.

9. Pp. 806–807 of 161 Ct.Cl.

completed his contract, and, as provided by the contract, received his final payment upon the execution of a full release, and then * * * later attempts to assert claims. * * *

The following findings by the ASBCA in relation to the release of mortgage area B are fully supported by the evidence that was before the board; and they were in no way arbitrary, capricious, or erroneous:

> There is no evidence contemporaneous with the execution of the release * * * as to any intention to limit the generality of the release * * * beyond what is stated therein. * * * [and]
>
> * * * the subjective and unmanifested intention of * * * [plaintiff's] vice president did not avoid the otherwise general effect of the release * * *

■ The board committed no error in holding the wiring claim barred by the release as to mortgage area B.

In support of the validity of the release of August 30, 1962, as a bar to the wiring claim with respect to mortgage area A, defendant relies upon the cases previously cited and argues that the wiring claim was not specifically delineated, either as to substance or amount, in the exception to the release.

Plaintiff contends that the broad exception contained in the release of August 30, 1962, "clearly reserved the wiring claim," wherefore the conclusion of the board was " * * * contrary to the obvious purpose and intent of the language of the exception * * *," since "the contractor did not intend to release the government from all claims * * *," and "the contractor and the contracting officer were both aware of the pending wiring claim * * *." Plaintiff cites the further stipulation before the ASBCA that the officer who executed the release for plaintiff would have testified, if called, that he intended the exception language to cover the wiring claim.

Previous recitations in this opinion show that with respect to the release of August 30, 1962, the ASBCA found:

> * * * There is no evidence contemporaneous with the execution of the release * * * as to what was intended by the * * * exception. * * *
>
> * * * [T]he language of the * * * exception did not include the instant claim. * * * Nor can the exception be given the scope contended for on the basis of the subjective and unmanifested intention of * * * [plaintiff's] vice president.

Defendant asserts the finality of the ASBCA's findings. Plaintiff says of the same findings that they cannot stand. Thus have the parties joined issue on questions relating to the intention of the parties, defendant relying upon the finality of the board's findings while plaintiff assails them as unsupported by substantial evidence.

The view which we take of the legal effect of the release of August 30, 1962 (mortgage area A), makes it unnecessary to pass upon questions pertaining to the intention of the parties in the terms in which the board treated them. The contentions of the parties relative to finality of the board's findings or, contrariwise, the lack of support of those findings by substantial evidence, are thereby rendered moot.

The fact is plain, from the merest perusal of the blunderbuss exception reserved by plaintiff in the release of August 30, 1962, that the wiring claim was not *specifically* delineated, either as to substance or amount. The contract provision, under which the release was required, stipulates the reservation only of "such claims * * * as may be specifically excepted * * * in amounts stated * * *."

If consideration of the controversy is halted at this point, plaintiff has simply failed to abide by the contract requirements and cannot now be heard to complain of its own ineptitude.

Upon further review of the contract provision, however, it appears that "final amounts shall be payable after the * * [contractor] shall have furnished * * [the contracting agency] with a release, *if required* * * *." The contracting agency was free to make final payment, in its discretion, without a release from the contractor. It was also fully authorized, in its discretion, to require a release as a condition of final payment, in which event the reservations, if any, in the release had to pertain to "such claims * * * as may be specifically excepted * * * in amounts stated * * *." [Emphasis supplied.]

■ In this case the contracting agency required a release as a condition for making final payment. Plaintiff tendered and the contracting agency accepted a release containing a reservation which, although it did not describe the excepted claims either specifically or in amounts stated, was so broad as to encompass almost anything the contractor might later assert to be within its meaning.

The parties were engaged in performing the contract when final payment was made in exchange for the release. The exchange was a single transaction. The contracting agency had the authority, in its discretion, to make the final payment without a release. Having elected to require the release, it had the further authority, under the terms of the contract, to withhold the final payment upon the failure of the contractor to tender a release which was in conformity with the contract requirement. The release tendered by the contractor in this case not only did not meet the contract requirement; it was so broad as to make the release virtually meaningless. The contracting agency nevertheless accepted it and made the final payment.

Logic compels the conclusion that, under the circumstances, the contracting agency simply went through the motions of observing the form of the release requirement, but in doing so waived the substance. It accepted a release which released nothing.

It is therefore our conclusion that the release of August 30, 1962, was ineffective to release the wiring claim as to mortgage area A, and that the ASBCA was in error, as a matter of law, in holding otherwise.

II

Following are the findings made by the ASBCA on the wiring claim:

* * * The following provisions of the specifications are pertinent:

"Section 22, Electrical, Interior

"22.2 *Rules and Regulations.*—The work under this section shall comply with the latest edition of the National Electric Code published by the National Board of Fire Underwriters, including any supplements thereto. Whenever the drawings or specifications require materials, workmanship, arrangement or construction of a higher standard or larger size than is required by the National Electric Code, the drawings and specifications shall take precedence. Should there be a direct conflict between the drawings or specifications and the National Electric Code, the Code shall govern.

"22.3 *Current characteristics* for dwelling units is 120/240 volt, single-phase, 3-wire.

* * * * * *

"22.9.4 Air conditioning outlets shall be 3-wire, 20 amperes, 250 volts, equal to Pass and Seymour No. 6810–1; Hart and Hegeman; Harvey Hubbel, or approved equal."

The contract drawings show three-wire installation for air conditioner outlets. The contract did not include air conditioner units. The outlets were for tenant-supplied air conditioner units.

Appellant and its electrical subcontractor were aware of the three-wire requirement. The subcontractor purchased three-wire conductor for air conditioner outlets and other purposes and in a quantity which was sufficient to cover the air conditioner outlets. However, on installation, appellant and its electrical subcontractor used two-wire

conductor until respondent stopped them and directed that three-wire conductor be used, with the third, or neutral conductor, wired loose, and capped, in the appropriate box, without being connected.

Appellant's position was that three-wire conductor was ruled out by section 22.2 of the specifications because the National Electric Code forbade the connecting up of the neutral conductor in an outlet such as that specified here for a 240–250 volt air conditioner, which would render the neutral conductor useless.

Witnesses for appellant at the hearing were obliged to concede, nevertheless, that leaving the neutral conductor loose, but protected, would not violate the code, which required only that it be protected; that the contract did not call for connection of the neutral conductor, and that the neutral conductor could be used in the future in adapting an outlet to fit a 120–130 volt air conditioner which a tenant might wish to use.

At the conclusion of the foregoing findings, the board turned to the subject of the releases with the following transition:

> * * * Moreover, the dispute concerned only the housing units in mortgage areas A and B, and as to these any claim of appellant has, in our opinion, been released.

Following discussion of the releases executed by the contractor, the board concluded its opinion with the following sentence:

> * * * The claim being without merit, and in any event released, the appeal is denied.

While plaintiff's brief challenges the correctness as well as the finality of the board's conclusion that the wiring claim was without merit, it directs no specific challenge to the board's findings of fact as above set forth. In support of its challenge of the board's conclusion, plaintiff relies upon additional facts, drawn from the record underlying the board's decision. Defendant relies upon the same source for facts with which to refute plaintiff's facts and contentions. We consider the administrative record for help in determining what the Board found, and would be required to find.

The requirement of section 22.3 of the specifications, describing "current characteristics for dwelling units" as "120/240 volt, single-phase, 3-wire" meant that electric current coming in from the outside would have to be of the magnitude of 240 volts. Once the current was available, it would be delivered to some receptacles at 120-volt strength and to others at 240 volts.[10]

The current was delivered from the outside to a panel box inside, which contained a main switch. The evidence does not delineate in detail the wiring necessary to deliver 240 volts from the outside to the panel box.

The "3-wire" reference in section 22.3, moreover, did not mean that all current deliveries inside the dwelling units were to be made by 3-wire conductors, but only that deliveries to and from the panel box by 3-wire conductors should be used as and when specified. Actually, much of the inside wiring was, by specification, done with 2-wire conductors.

A 3-wire conductor consists of a cord or cable or a metal tubing enclosing three insulated wires, one black, one red, and one white. There is, in addition, an uninsulated copper wire, used for grounding.

A 2-wire conductor similarly consists of a cord or cable or tube containing two insulated wires and a third, uninsulated wire for grounding. One of the insulated wires is black, the other white.

In the installation of either type of conductor, the white wire is supposed never to be attached to a hot terminal. The National Electric Code, however, in recognition of the facts of life as demonstrated by working electricians, had

---

10. Ordinarily, the distinction is between 110 volts and 220 volts. These figures represent minimum strengths. For present purposes there is no material difference between voltages of 110 to 125 volts, or between 220 to 250 volts.

approved the hookup of the white wire to a hot post, if the ends of the wire (at the panel box and at the outlet) were painted black. Since white meant a non-hot wire, such a wire carrying current had to be painted black to show its current carrying use. Otherwise, a workman might cut into it or handle it in such a way as to get a shock. With this exception, the white wire was supposed to be left unattached, in both the panel box and the outlet in the delivery of 240 volts, and some safety rules suggested that the ends be capped as a further precaution.

The evidence does not explain the apparent superfluity of the white wire in a 240-volt circuit,[11] and much of the controversy in the present case stems from it.

As indicated by defendant, the Navy over-designed its solution to the problem of delivering either 120 volts or 240 volts to the air-conditioning outlets in the rooms of the dwelling units. The specifications called for the initial delivery of 240 volts. They did not explain just how this strength was to be reduced to 120 volts. This omission proved to be another element confusing to the electrical subcontractor.

The specifications and drawings clearly indicated the requirement of 240 volts at the receptacle, to be delivered by 3-wire conductors.

The panel box was equipped to serve this purpose. By connecting the black and red wires of the 3-wire conductor to the hot posts in the panel box, attaching the uninsulated wire to the neutral or ground post, and leaving the white wire unattached, 240 volts would flow to the air-conditioning outlet.

The flexibility contemplated by the Navy design, unexplained in the specifications or the drawings, called for detaching one wire (either black or red) from its hot posts in both the panel box and the receptacle, and connecting the white wire to the neutral blocks in both the panel box and the receptacle. Such a circuit would have supplied 120 volts (actually 110 to 125 volts) to the receptacle. It has, in fact, done so since the corrective wiring was installed in mortgage areas A and B.

In order to return the receptacle to 240 volts, an electrician could have disconnected the white wires from the neutral posts in both the panel box and the receptacle, leaving the ends coiled in the boxes, and reconnected the idle hot wire (red or black) to hot posts in the panel box and the receptacle, and there would have been a flow of 240 volts as before.

The electrical subcontractor read the specifications and drawings correctly. He submitted and obtained approval of shop drawings of his own, showing 3-wire conductors delivering 240 volts to the air-conditioning receptacles. He even laid in a supply of 3-wire conductors with which to make the installations.

When it came to installation, however, his thinking began at the receptacle rather than at the panel box. The specifications called for "outlets * * * 3-wire, 20 amperes, 250 volts, equal to Pass and Seymour No. 6810–1; * * * or approved equal." The electrical subcontractor elected to use, and obtained approval for the use of, a crow's foot (3-slot) receptacle made by Slater.[12] Examination of it indicated connecting posts for three wires but the electrician correctly reasoned that one post had to be devoted to the uninsulated ground wire, wherefore by the time two wires were connected to the other two posts all connections would be in use, leaving one insulated wire idle. He concluded

11. One inference to be drawn from the evidence is that the unattached white wire somehow served as additional grounding when used in metal tubing, and that this purpose was obviated when the live conductors were encased in an asbestos cable, known as Romex. The electrical sub-contractor in this case sought and obtained approval for the use of Romex cable, thereby adding to the confusion about the white wire.

12. This receptacle was in all material respects identical with the Pass and Seymour outlet.

that a 2-wire conductor not only would suffice, but was the only kind usable in the installation of the specified receptacle.

His judgment in this matter was confirmed, after the event, by the opinion of the Chief Electrical Inspector for Fairfax County, Virginia, who concluded that the receptacle was intended for use with a standard 2-wire conductor. The Inspector reasoned that the only proper method of wiring the receptacle for 240 volts would be to attach two conductors, each carrying 120 volts, to the two hot terminals in the receptacle, to which the ground wire likewise had to be attached, thereby preempting the neutral post. If a 3-wire conductor were used, he concluded, the third conductor could not be connected to either of the hot terminals, nor could it be connected to the grounding terminal without creating a hazardous condition in violation of the National Electrical Code.[13]

It is not established by the evidence that the subcontractor made known his dilemma to the prime contractor, but the subcontractor did request plaintiff to arrange a meeting with the resident officer in charge of construction for the purpose of discussing some of the subcontractor's problems. Such a meeting was held with the resident officer and the architect. The subcontractor's effort to discuss with them what he considered to be discrepancies between the specifications and the drawings might have been cut off by the resident officer's curt remark that the subcontractor "was being paid to install the work, not to engineer it." The question of using 2-wire conductors in lieu of 3-wire conductors was thus never given expression.[14]

At the outset of the contract work, in August 1961, plaintiff erected a sample unit as a demonstration for the Navy. The electrical contractor used, in this unit, a 2-wire conductor from the panel box to the air-conditioning outlet or receptacle. In so doing, he fastened both the black wire and the white wire to the hot posts in both the panel box and the receptacle, and attached the uninsulated wire to the neutral posts in both.[15]

The resulting circuit carried 240 volts from the panel box to the outlet. Just such a circuit was in operation when a tenant in mortgage area C connected a 110-volt appliance and blew a fuse.[16] And, for that matter, just such circuits are still operating in mortgage area C, where plaintiff was not required to replace 2-wire conductors with 3-wire conductors.[17]

13. The Inspector was, of course, correct in reasoning that the third conductor could not be attached either to a hot terminal or the neutral post as long as 240 volts were being delivered. He did not direct his attention to the possibility of leaving the third conductor idle and unattached at both ends, which was what the design contemplated.

14. The contract contained conventional provisions designed for the prevention of such misunderstandings, of which the following from paragraph 2(d) of the General Provisions is typical: " * * * The eligible builder shall check all Drawings and Specifications furnished him immediately upon their receipt and shall promptly notify the Contracting Officer of any discrepancies. * * * Deviations from the Drawings and the dimensions therein given, whether or not error is believed to exist, shall be made only after written authority is obtained from the Contracting Officer."

15. At the receptacle end he looped the ground wire under a screw fastening the outlet box to the wall before attaching the end to one of the posts in the crow's foot, thus grounding the outlet box and the crow's foot with the one wire.

16. The blown fuse was in the panel box. The overload of 240 volts flowing into a 110-volt appliance had shorted a circuit in the appliance, burning it out; the resulting short circuit of the lines backed up to the panel box and blew the fuse there.

17. In mortgage area C, the delivery of 240 volts can be reduced to 120 volts by disconnecting the white wire (now painted black) from the hot posts in the panel box and the receptacle and reattaching it to the neutral posts in the panel box and the outlet (after restoring the ends to white instead of black).

The electrical inspector was on hand as the pilot project was being built, and was likewise on the job during the whole course of work as the subcontractor installed 2-wire conductors in 392 of the 450 units. [18] It is not established by the evidence that the inspector ever consciously registered on the use of the 2-wire conductors, but he certainly had ample opportunity to do so. In any event, he raised no point concerning it until after the blown fuse episode, when his superiors queried him about it. He then reported to the subcontractor that the question had been raised.

When the blown fuse incident occurred, the resident officer ordered (1) all 2-wire conductors to be removed and replaced with 3-wire conductors in units already completed in mortgage areas A and B and (2) the use of 3-wire conductors in the remaining uncompleted units, with the white wire to be connected to the grounding terminal in the receptacle. The electrical subcontractor protested that such an installation would violate the National Electrical Code. The matter was thereupon referred to the District Public Works Officer who, with the architect, met with the electrical subcontractor and a representative of the National Board of Fire Underwriters under whose aegis the National Electrical Code is published. The Fire Underwriters' representative advised that the installation required by the resident officer would constitute a violation of the Code, and that the 2-wire installation theretofore made by the subcontractor was the correct installation under the requirements of the Code.[19]

The outcome of the meeting was that plaintiff was ordered to (and did) [20] replace all 2-wire conductors with 3-wire conductors in mortgage areas A and B,

after the resident officer's requirement of grounding the third conductor was modified to have that conductor left unattached and loose in the box.

The rewiring work necessitated tearing out wallboard, baseboards, and portions of ceilings in order to gain access to concealed wiring, and after replacement of the wire, the torn out portions had to be patched and painted. This work was performed by the subcontractor at some additional expense.

By way of recapitulation, it is to be noted that:

(1) The specifications and drawings reflected an overdesign of wiring to accomplish the flexibility (120–240 volts) desired by the Navy.

(2) The overdesign did not conflict with the National Electrical Code.

(3) The directive by the resident officer to attach the white wire to neutral posts in a 240-volt circuit was in conflict with the requirements of the National Electrical Code. The directive was withdrawn before any installations were made under it.

(4) The specifications of a crow's-foot outlet, having only three posts (two hot and one for grounding), did not conflict with the drawings requiring 3-wire conductors to the outlets. The requirement of the 3-wire conductor in a 240-volt circuit was not explained, but its presence did not create an inconsistency or ambiguity between specifications and drawings.

(5) The attachment of the white wire to hot posts, in 2-wire conductors installed by the electrical subcontractor, was in violation of the National Electrical Code, but the Code permitted remedial action consisting of painting the ends of

---

18. As each unit was completed, it was inspected and approved by the supervising inspector and the resident officer, but the wiring was, of course, mainly hidden from view at that time.

19. Except, of course, for the necessity of painting the ends of the white wires black.

20. Before complying with the order, plaintiff offered to make a refund to the Navy reflecting the savings in cost. The offer was refused.

the white wires black to signify their current carrying use.[21]

(6) In the absence of explanation in the specifications or drawings of the design intent to leave the white wires loose and coiled in the boxes in the installation of 3-wire conductor circuits of 240 volts, the subcontractor's surmise that 2-wire conductors would serve the purposes of the design (including flexibility) was reasonable and was made in good faith.

(7) The subcontractor acted upon his surmise without making inquiry of the contracting officer or any of his representatives (the resident officer or the inspector) and without authorization (oral or in writing) to deviate from the specifications and drawing.

On these facts the wiring claim is without merit under the applicable law.

■ There was no discrepancy between the contract drawings and the specifications in respect to electrical outlets for window air-conditioners, nor was the specified outlet in conflict with the National Electrical Code. Consequently, no foundation exists for plaintiff's reliance upon Government responsibility for ambiguous or misleading specifications under the doctrine of Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947).

Similarly, there is no foundation for the application of the rule that, wherever there is a difference between the specifications and the drawings, the specifications shall govern, as in Guyler v. United States, 314 F.2d 506, 161 Ct.Cl. 159 (1963).

■■ Once the subcontractor had installed the 3-wire conductors as required by the plans and specifications, it was apparent that no discrepancy had existed, nor was there any conflict with the Na-

tional Electrical Code. In using 2-wire conductors for the installation, the subcontractor deviated from the specifications and the drawings. It was not within his province to decide what materials were equally satisfactory and substitute his judgment for that of the Government. The Government had a right to insist on use of the wiring specified, regardless of its reasons for selection of the conductors. Farwell Co. v. United States, 148 F.Supp. 947, 137 Ct.Cl. 832 (1957). Since plaintiff failed to advise defendant of the alleged conflict, it is bound in these circumstances by the Government's interpretation of the contract requirements. Beacon Constr. Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963).

■ With respect to the subcontractor's excuse for his failure to make inquiry concerning the specified receptacle —because of the resident officer's curt dismissal of his effort to discuss the alleged discrepancy—reference may be made to the Supreme Court's observation in United States v. Blair, 321 U.S. 730, 736, 64 S.Ct. 820, 823, 88 L.Ed. 1039 (1944) concerning a contractor's failure to follow the appeal procedure set forth in the contract:

* * * Even if the conduct of the Government superintendent or contracting officer, or their assistants, was so flagrantly unreasonable or so grossly erroneous as to imply bad faith, the appeal provisions of the contract must be exhausted before relief is sought in the courts. * * *

The subcontractor here could have brought the matter to the attention of the prime contractor (which he did not do) and plaintiff could have bypassed the resident officer, if necessary, to obtain a ruling from the contracting officer.

■ Plaintiff's further contention that the Government knowingly acqui-

---

**21.** As heretofore noted, the remedial action permitted by the Code is deemed to be a concession to the known performance of working electricians. As such it may well represent a practical adaptation to the facts of life, but it does not obviate the danger that at some future time in the course of repairs between the panel box and the outlet a workman might come upon a white wire and assume (erroneously) because of its color that it was a neutral wire when in fact it was a hot wire.

esced in the installation of 2-wire conductors until 392 units had been completed likewise fails of substantiation in fact. The electrical inspector's attention was not drawn to the problem, and it cannot be said that any Government representative consciously acquiesced in plaintiff's procedure. Therefore there is no basis for equitable estoppel.

In view of the foregoing, it must be concluded that plaintiff has failed to make a case for a constructive change order based upon defendant's requirement that the wiring be installed as specified by the contract. As noted in defendant's opening brief (pp. 26–27):

> since * * * the Contracting Officer's directives to plaintiff and to its electrical subcontractor merely required compliance with the drawings and specifications upon which plaintiff bid and with which it had agreed to comply in doing the work, neither plaintiff nor its subcontractor is entitled to recover any amount in addition to the contract price which defendant agreed to pay (and has paid) for performance of the contract. [Citing]: Moyer Bros. v. United States, 156 Ct.Cl. 120 (1962); Oliver-Finnie Co. v. United States, 150 Ct.Cl. 189, 201, 279 F.2d 498, 506 (1960); Anderson v. United States, 143 Ct.Cl. 729 (1958); Carman v. United States, 143 Ct.Cl. 747, 166 F.Supp. 759 (1958); Octagon Process Inc. v. United States, 141 Ct.Cl. 599 (1958); and Henry Spen and Co. v. United States, 139 Ct. Cl. 613, 153 F.Supp. 407 (1957).

We conclude that from the standpoint of the constructive change order contention (which reflects the main thrust of plaintiff's petition), the ASBCA determination that the wiring claim was without merit was not arbitrary, or capricious, or lacking in support by substantial evidence, or so grossly erroneous as necessarily to imply bad faith, and that in making the determination the board committed no error of law.

■ In support of its claim plaintiff makes the further contention that "the substitution of a three-conductor wire was a useless and unnecessary change which made the air conditioning circuits no more useful or flexible than they were as originally installed,[22] and consequently the contracting officer should have accepted the original installation as having met the test of substantial performance."[23]

Quite aside from the right of the Government to expect that 3-wire conductors, which the specifications called for, would be used regardless of its reasons for so specifying, as in *Farwell*, supra, 148 F.Supp., p. 947, 137 Ct.Cl., p. 836, it cannot be said that on the facts "the substitution of a three-conductor wire was a useless and unnecessary change," or that the change "made the air conditioning circuits no more useful or flexible than they were as originally installed." It is true, of course, that the 2-wire conductors, as installed, delivered 240 volts, and that the circuit could be reduced to 120 volts and was therefore flexible. The fact remains that the changeover contemplated by the Navy's design was imbued with safety features superior to those inherent in the changeover of the 2-wire conductor installation.[24]

If, however, it be granted, for the sake of discussion, that the 2-wire conductor

---

22. The petition contains an allegation that "the directive * * * to replace [the installed] wiring was unreasonable and unnecessary, served no valid or useful purpose, and constituted a change in the contract work * * *."

23. The petition contains no specific reference to "the test of substantial performance." Defendant, however, has responded to the contention without making any point with respect to pleading.

24. The changeover in the 3-wire conductor design required only the detachment of one hot wire (red or black) and the attachment of the white wire to neutral posts. The white wire was thus never attached to a hot terminal. The changeover in the 2-wire conductor installation, on the other hand, not only required the white wire to be detached from a hot terminal before its attachment to a neutral post but, inasmuch as the ends had

installations in mortgage areas A and B served the purpose (as was certainly the case in mortgage area C, where no replacements were ordered), the application of the test of substantial performance to the instant case in its present posture is still by no means clear.

For one thing, the doctrine of substantial performance had its origin, and has had most of its development, in cases where the owner of the building has withheld from the contractor all or part of the contract price. In the present case, the contractor has received the contract price in full. No case has been cited, and we have found none, wherein a contractor has been allowed payment in addition to the contract price on the basis of alleged substantial performance.

Moreover, in those cases where the test of substantial performance has been applied, the courts have uniformly held that the owner, even though he be required to pay over the contract price as for substantial performance, may withhold or recoup therefrom something to make up the difference to him. At this point the cases diverge, some courts assessing the measure of his damages as the cost of replacement, others allowing only the difference between the value of the structure as completed and the value it would have had if the proper installations had been made.

The essence of the doctrine is to prevent forfeiture, and the test of forfeiture usually is that the owner's requirement, if followed, would amount to economic waste. This is the spirit of the observation by Cardozo, J., in Jacob & Youngs v. Kent, 230 N.Y. 239, 129 N.E. 889, 891, 23 A.L.R. 1429 (1921):

    \* \* \* We must weigh the purpose to be served, the desire to be

gratified, the excuse for deviation from the letter, the cruelty of enforced adherence. Then only can we tell whether literal fulfillment is to be implied by law as a condition.

In some of the cases, the courts have refused to apply the test of substantial performance where the contractor's deviation from the specifications was intentional, as here, even though the deviation was, as here, undertaken in good faith. Shell et al. v. Schmidt et al., 164 Cal.App.2d 350, 330 P.2d 817, 76 A.L.R.2d 792 (1958). Other authorities recognize good faith regardless of intentional deviation.

Our conclusion is that the requisite ingredients for the test of substantial performance—forfeiture and economic waste—are not present in this case, and that the doctrine of substantial performance is therefore inapposite.[25] Cf. Annotation, 76 A.L.R.2d 805, §§ 5–6, 815–826 (1961); Corbin, Contracts §§ 700–712 and 1089–1091 (1964). In addition, the cases permitting recovery for substantial performance generally involve instances where it was claimed that substantial performance was tantamount (in the particular circumstances) to full compliance—not, as here, where there has been a clear and admitted deviation.

Absent any right of plaintiff as a matter of law to recover, the questions of defendant's further affirmative defenses (lack of privity of contract between the subcontractor and defendant; plaintiff not the real party in interest; and the statutory ceiling on recovery) need not be reached.

Defendant's motion for summary judgment is granted, plaintiff's cross motion for summary judgment is denied, and plaintiff's petition is dismissed.

---

had to be painted black, the electrician making the changeover was required (1) to determine which of two black wires had originally been white, and (2) to repaint the black ends white to signify a neutral wire. Moreover, there was always the danger, in making repairs between the panel box and the receptacle, that a workman might mistake a white wire for a neutral wire when in fact it was a hot wire.

**25.** Aside from the fact that in this case the full contract price has been paid, application of the test of substantial performance would result in a virtual standoff. If plaintiff should be deemed to recover the cost of the replacements, defendant would be entitled to offset against the recovery either the same cost or the difference in value between the structure as completed and the structure as it should have been built.